RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 11a0296a.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
————————————

STANLEY JALOWIEC,

    *Petitioner-Appellant,*

  *v.*

MARGARET BRADSHAW, Warden,

    *Respondent-Appellee.*

No. 08-3249

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 03-00645—Donald C. Nugent, District Judge.

Argued:  June 9, 2010

Decided and Filed:  November 23, 2011

Before:  GILMAN, ROGERS and McKEAGUE, Circuit Judges.

————————————

## COUNSEL

————————————

**ARGUED:**  Kimberly S. Rigby, OFFICE OF THE OHIO PUBLIC DEFENDER, Columbus, Ohio, for Appellant.  Charles L. Wille, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:**  Kimberly S. Rigby, Gregory W. Meyers, OFFICE OF THE OHIO PUBLIC DEFENDER, Columbus, Ohio, for Appellant.  Charles L. Wille, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

————————————

## AMENDED OPINION

————————————

  McKEAGUE, Circuit Judge.  This is an appeal from a denial of habeas relief. Petitioner Stanley Jalowiec was convicted of murder and sentenced to death.  After the Ohio courts denied Jalowiec's requests for appellate and post-conviction relief, the district court denied all forty-seven claims of error asserted in Jalowiec's petition for

writ of habeas corpus.  We certified five claims for appeal.  In these claims, petitioner contends that he was denied a fair trial due to the prosecution's wrongful suppression of *Brady* material; that he was denied effective assistance of counsel at trial by virtue of defense counsel's undisclosed conflict of interest and, in the penalty phase, because counsel failed to object to hearsay evidence and failed to adequately prepare and present mitigation evidence; and that he was denied effective assistance of counsel on appeal, because counsel failed to assert claims based on trial counsel's conflict of interest and wrongful admission of hearsay evidence at trial.  For the reasons that follow, we conclude that none of the claims warrants habeas relief and we therefore affirm the judgment of the district court.

## I.  BACKGROUND

The body of Ronald Lally was found on a cemetery roadway in Cleveland on January 19, 1994.  Lally had suffered a gunshot wound to the head and other blunt force injuries causing death.  Lally had been expected to testify for the prosecution in a criminal trial set to begin later that day.  The criminal trial involved drug-trafficking charges against Raymond Smith and his son Danny Smith.  After an extensive investigation, Stanley Jalowiec was indicted in March 1995 in Lorain County, Ohio, charged with murdering Lally.  Raymond Smith was also charged with the murder.  In a separate trial, Raymond Smith was found guilty in December 1995 and sentenced to death in January 1996.  Jalowiec's trial began in March 1996.[1]

The indictment charged Jalowiec with aggravated murder for causing Lally's death purposely and with prior calculation and design, and included specifications for killing Lally to prevent his testimony in a criminal proceeding, and for firearm possession.  The prosecution's case was based largely on the testimony of Raymond Smith's other son, Michael Smith, who testified that he had been present at the time of Lally's murder, but had not participated.  The defense introduced no proofs in the guilt

---

[1]Danny Smith was also charged with Lally's murder, was tried separately following Jalowiec's trial, and was acquitted.

phase of the trial.  The facts shown by the trial proofs were summarized by the Ohio

Supreme Court in *State v. Jalowiec*, 744 N.E.2d 163 (Ohio 2001), as follows:

> On the morning of January 19, 1994, a partially clad male body was
> found in Woodland Cemetery in Cleveland. Two weeks later, the body
> was identified as that of Ronald Lally of Elyria. Over a year later, the
> grand jury indicted defendant-appellant, Stanley E. Jalowiec, for
> aggravated murder, with firearm and death-penalty specifications. The
> indictment alleged that Jalowiec purposely killed Lally to prevent him
> from testifying in criminal proceedings, which had been scheduled to
> begin on January 19, 1994. Subsequently, a jury found Jalowiec guilty
> as charged, and he was sentenced to death.
>
> In June 1993, Ron Lally contacted the Elyria police to volunteer as a
> police informant. Lally signed an agreement to become a confidential
> informant for the Elyria police and agreed to make controlled drug buys.
> On June 7, 1993, with the assistance of Officer Scott Ashley and
> Detective Alan Leiby, Lally made a controlled drug buy of crack cocaine
> from Danny Smith and his father Raymond Smith while wired with a
> hidden monitoring device. As a result of the controlled buy, police
> arrested both Raymond Smith and Danny Smith in August 1993 and
> charged them with aggravated drug trafficking. Both cases were
> eventually set for trial on January 19, 1994.
>
> On January 18, 1994, the evening before the murder, Brian Howington
> and Jalowiec went to several bars in downtown Elyria. (Howington knew
> Jalowiec because Jalowiec used to visit Howington's aunt, Joann Corrine
> Fike, when Howington lived with her.) Jalowiec then asked Howington
> to accompany him to a friend's house on Middle Avenue. There,
> Howington met Ron Lally and his roommate, and the four of them
> smoked crack cocaine. Around 11:30 p.m., Jalowiec, Howington, and
> Lally went to Fike's house and "[s]hot pool, partied some more."
>
> About an hour later, Jalowiec got a page and asked Howington if he
> could borrow Fike's car, a Chrysler LeBaron convertible. Though
> Howington was hesitant, he relented after Jalowiec persisted. Around
> 1:00 a.m., Jalowiec and Lally left Fike's house in the LeBaron. The next
> time Howington saw the car was around 5:00 a.m. when Jalowiec and
> Raymond Smith returned it to Fike's apartment. At that time, the car was
> covered with ice, and Jalowiec and Smith told Howington that the car
> had been washed. Fike testified that Jalowiec told her that he had washed
> the car because there was blood on it as a result of a fight he had had
> with someone at Mom's Open Kitchen.

Sharon Hopkins testified that she was at Razzle's bar in Elyria one night in January 1994 with her brother, Terry Hopkins, Raymond Smith, Danny Smith, Michael Smith (another son of Raymond), and several others, including Jalowiec. The group stayed at Razzle's until it closed and then, without Jalowiec, went to eat at Mom's Open Kitchen until around 2:45-3:00 a.m.

After leaving Mom's, Sharon Hopkins rode in Danny Smith's car with several people including Raymond, Danny, and Michael Smith. They traveled on Middle Avenue past the railroad tracks just outside the Elyria city limits and dropped Raymond and Michael Smith off by a wooded area. They drove back over the tracks and pulled into a parking lot. Approximately five to ten minutes later, a convertible drove over the tracks to where they had dropped off Raymond and Michael Smith. Danny Smith said, "That is it."

Several minutes later, the convertible drove by again heading toward town, and Danny Smith's car began to follow it. Shortly thereafter, Danny Smith signaled the convertible to pull over and ducked down in the front passenger seat while telling Sharon Hopkins to get out and ask the people in the convertible whether they had picked up Michael Smith. Sharon Hopkins saw Jalowiec get out of the driver's seat of the convertible. Jalowiec responded that Michael Smith was in the car. Although Sharon Hopkins could not see the other occupants, she could tell that there were four people inside the convertible. Danny Smith then drove Sharon Hopkins home.

Later that morning, at around 3:30-4:00 a.m., Danny Smith arrived back at his apartment. Terry Hopkins arrived a little later and noticed that Danny Smith was "nervous and said he was feeling sick to his stomach." Danny Smith told Hopkins that "they had done it, they did it." Hopkins then went back to his sister's apartment across the street from Danny Smith's apartment. Later, Hopkins visited Danny Smith again and also saw Jalowiec, Raymond Smith, and Michael Smith. Jalowiec said, "They stomped him and ran him over with a car." The others there indicated that "they shot him and cut him." According to Hopkins, they were "[k]ind of like bragging about it." Danny Smith told Hopkins they wanted this person killed because he had worn "a wire on him on a drug sale."

At approximately 9:55 a.m. on January 19, 1994, Cleveland homicide detective Michael Beaman was summoned to Woodland Cemetery. A male body had been found on a cemetery roadway. Some of the victim's clothing was nearby in a snow bank. There was no identification on or near the victim and police did not learn the identity of the victim, Lally, until a few weeks later.

Dr. Heather Raaf, a forensic pathologist with the Cuyahoga County Coroner's Office, performed the autopsy on Lally. Dr. Raaf testified that teeth in Lally's mouth had been knocked out by a gunshot. Dr. Raaf estimated that Lally had sustained at least eleven blows to his head and that his injuries were consistent with being stomped or struck by a vehicle several times. Dr. Raaf determined that Lally's death resulted from a gunshot wound to the head and multiple blunt impacts to the head.

The drug trafficking cases against Danny and Raymond Smith were subsequently dismissed because Lally, the primary witness in both cases, was dead.

After an extensive police investigation, the grand jury indicted Jalowiec on March 8, 1995, for aggravated murder with a firearms specification. In addition, a death-penalty specification alleged that Jalowiec purposely killed Lally in order to prevent his testimony as a witness in a criminal proceeding.

At trial, the key witness for the prosecution was Michael Smith, son of Raymond Smith and brother of Danny Smith. Michael Smith contacted Detective Leiby in April 1994 because he was bothered about having witnessed the Lally murder. During Raymond Smith's murder trial, Michael Smith had been unavailable to testify, and the prosecution proffered testimony from him that had been elicited in a deposition. *State v. Smith* (2000), 87 Ohio St.3d 424, 428, 721 N.E.2d 93, 102. However, at Jalowiec's trial, Michael Smith testified as a prosecution witness.

Michael Smith testified that, purely by chance, he had met his father and brother at Mom's Open Kitchen around 2:30 a.m. on the night of the murder. Raymond Smith had made a phone call and indicated to Michael Smith that he was going to leave. Michael agreed to go with his father and left with him and his brother, Danny Smith. The Smiths and Danny Smith's girlfriend got in Danny Smith's car and both Raymond and Michael Smith were dropped off on Middle Avenue. Raymond and Michael waited outside in the cold, even though Michael had no idea what they were waiting for. The LeBaron driven by Jalowiec with Lally as a passenger pulled up to them and stopped. Raymond Smith told Lally to get in the back seat, and Michael Smith got in the back seat on the driver's side. Raymond Smith sat in the passenger side front seat and made introductions.

Shortly thereafter, Raymond Smith brandished a gun and told Lally, "Don't make any sudden moves." The group stopped to buy gas, beer, and cigarettes, then drove on Route 2 toward Cleveland. Raymond Smith asked Lally, "Why did you set my son up?" Lally denied doing so, but

appeared to be scared. Smith then told Lally, "We are going to give you some money, get you a bus ticket, you are going to get out of town."

During the trip into Cleveland, all four men were smoking crack cocaine. Lally agreed to leave town, and they drove to East Cleveland to buy some crack for Lally's trip. However, they saw police cars and fire trucks in the neighborhood and decided to drive back towards downtown Cleveland. As they drove, Raymond Smith directed Jalowiec to pull the LeBaron into a Cleveland cemetery.

Inside the cemetery, Raymond Smith got out of the car, put the gun to Lally's face, and ordered him out of the car. He then told Lally, "You will never snitch on nobody again." Michael Smith heard a gunshot and then heard Lally exclaim: "You shot me in my head, you shot me in my head." Raymond then told Michael and Jalowiec to get out and assist him. Jalowiec got out of the car, but Michael remained inside the car and did not look out. He heard "thumps like hitting" and heard Lally plead, "I won't tell nobody, please don't kill me, please don't kill me."

Michael Smith testified that after about two to five minutes of quiet, he could tell that the trunk had been opened and that his father and Jalowiec were trying to put something in the trunk. He heard someone say, "He ain't going to fit, * * * he is too stiff," then he heard something drop. Then Raymond Smith and Jalowiec got back in the car, and Jalowiec started the car and put it in reverse. According to Michael Smith, when Lally's body stopped the car from going any further, Jalowiec drove forward a short distance and then put the car into reverse. Michael Smith could feel the car hit something. Jalowiec did this three times and then drove out of the cemetery.

As they drove from the cemetery, Raymond Smith began arguing with Michael Smith: "This is for your brother, why didn't you get out and help?" While driving back to Elyria, Raymond took his gun apart and threw it out the window, piece by piece. Upon arriving in Elyria, they dropped Michael Smith off at Danny Smith's apartment.

Linda Luke, a forensic serologist in the coroner's office, conducted tests on stains found on the trunk liner of the Chrysler LeBaron. Luke testified that the DNA in Lally's blood sample was consistent with the blood found on the trunk liner.

After deliberation, the jury found Jalowiec guilty as charged.

At the mitigation hearing, Jalowiec made an unsworn statement. Other witnesses also testified on Jalowiec's behalf, including his former live-in girlfriend and several family members, including both of his parents. The prosecution presented seven witnesses in rebuttal. The jury recommended death, and the court sentenced Jalowiec to death.

*Id.* at 168-70 (footnote omitted).

Jalowiec's various and persistent efforts to obtain appellate relief and post-conviction relief from the Ohio courts have been unsuccessful.[2] He filed his petition for writ of habeas corpus in the Northern District of Ohio on July 2, 2003. In his amended petition, filed on November 21, 2005, Jalowiec asserted forty-seven claims for relief. In a lengthy and comprehensive opinion issued January 31, 2008, the district court denied all forty-seven claims. *Jalowiec v. Bradshaw*, No. 1:03-CV-645, 2008 WL 312655 (N.D. Ohio). Jalowiec timely filed notice of appeal. We granted a certificate of appealability as to the following five claims:

> I.     (Claim 20)  Whether the prosecution violated Jalowiec's rights under *Brady v. Maryland*, 373 U.S. 83 (1963), by withholding prior statements made to police by state witnesses and information regarding plea bargains and other inducements for testimony by such witnesses;
>
> II.     (Claim 31)  Whether Jalowiec was deprived of the effective assistance of counsel due to an alleged conflict of interest, by which counsel simultaneously represented a state witness for whom counsel obtained a sentencing benefit in return for the witness's testimony at Jalowiec's trial;
>
> III.     (Claim 35(d))  Whether trial counsel performed ineffectively during the penalty phase by failing to object to the admission of a hearsay statement of a co-defendant;
>
> IV.     (Claim 36)  Whether trial counsel performed ineffectively by failing to adequately investigate and prepare mitigation evidence for the penalty phase; and
>
> V.     (Claim 42(a) and (c))  Whether appellate counsel performed ineffectively on direct appeal by failing to raise the claims that Jalowiec's trial counsel had a conflict of interest and that hearsay evidence was improperly admitted at trial.

---

[2]These efforts are outlined in detail in the district court's opinion. *Jalowiec v. Bradshaw*, No. 1:03-CV-645, 2008 WL 312655 at *4-14 (N.D. Ohio). In addition, we note that Jalowiec has, during the pendency of this appeal, moved the state trial court for a new trial based on the allegedly unexhausted part of his *Brady* claim, discussed below in note 4.

The district court determined that federal habeas review of three of these claims—claims 20, 31 and 36— was barred by procedural default.  Nonetheless, the court addressed and rejected all five claims on their merits as well.

## II.  STANDARD OF REVIEW

### A.  AEDPA Review

We review the district court's legal conclusions and rulings on mixed questions of law and fact de novo, and review factual findings for clear error.  *Boykin v. Webb*, 541 F.3d 638, 642 (6th Cir. 2008).  Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), the federal courts may not grant habeas relief on any claim that was adjudicated on the merits in the state courts unless the adjudication resulted in a decision that:  (1) was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court; or (2) was based on an unreasonable determination of the facts in light of the evidence presented to the state courts.  28 U.S.C. § 2254(d).  Under the "contrary to" clause, a federal habeas court may grant the writ only if the state court arrived at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decided the case differently than the Supreme Court has on a set of materially indistinguishable facts.  *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).  Under the "unreasonable application" clause, a federal court may grant the writ only if the state court identified the correct governing legal principle from the Supreme Court's decisions but unreasonably applied that principle to the facts of the petitioner's case.  *Id.*  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  *Id.* at 411.  Rather, to warrant habeas relief, the application must be found to be "objectively unreasonable."  *Id.* at 409.  "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings.'"  *Renico v. Lett*, 130 S.Ct. 1855, 1862 (2010) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997)).

In analyzing whether a state court decision is contrary to or an unreasonable application of clearly established Supreme Court precedent, a federal court may look only to the holdings of the Supreme Court's decisions as of the time that the petitioner's state-court conviction became final. *Williams*, 529 U.S. at 390; *Miller v. Stovall*, 608 F.3d 913, 919 (6th Cir. 2010). However, the court may look to lower courts of appeals' decisions to the extent they illuminate the analysis of Supreme Court holdings in determining whether a legal principle had been clearly established by the Supreme Court. *Landrum v. Mitchell*, 625 F.3d 905, 914 (6th Cir. 2010). Finally, where factual findings are challenged, the habeas petitioner has the burden of rebutting, by clear and convincing evidence, the presumption that the state court's factual findings are correct. *See* 28 U.S.C. § 2254(e)(1); *Landrum*, 625 F.3d at 914.

AEDPA's deferential standard of review applies only to state-court adjudications on the merits. *Cone v. Bell*, 129 S.Ct. 1769, 1784 (2009). Where AEDPA deference does not apply, state-court adjudications of legal issues are reviewed de novo and state-court fact findings are reviewed only for clear error. *Id.*; *Evans v. Hudson*, 575 F.3d 560, 564 (6th Cir. 2009). Here, the district court concluded that many of Jalowiec's habeas claims, including some of those before us now, were procedurally defaulted—that is, denied on the basis of a state procedural rule. We review the district court's procedural default rulings de novo. *Cvijetinovic v. Eberlin*, 617 F.3d 833, 836 (6th Cir. 2010).

### B. Procedural Default

Where the state courts have declined to reach the merits of a state prisoner's federal claims due to application of "an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). A habeas petitioner's claim will be deemed procedurally defaulted if each of the following four factors is met: (1) the petitioner failed to comply with a state procedural rule; (2) the state courts enforced the rule; (3) the state procedural rule is an adequate and independent state

ground for denying review of a federal constitutional claim; and (4) the petitioner has not shown cause and prejudice excusing the default. *Guilmette v. Howes*, 624 F.3d 286, 290 (6th Cir. 2010). In determining whether a state procedural rule was applied to bar a claim, a reviewing court looks to the last reasoned state-court decision disposing of the claim. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991); *Guilmette*, 624 F.3d at 291.

Even if the first three factors are satisfied, the petitioner may still avoid the procedural bar and obtain merits review of his habeas claim if he demonstrates there was "cause" for his noncompliance with the procedural rule and he was actually prejudiced by the alleged constitutional error. *Haliym v. Mitchell*, 492 F.3d 680, 690 (6th Cir. 2007). The "cause" standard requires the petitioner to show that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Id.* at 690-91 (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). This may be satisfied, for instance, by a showing of interference by officials that makes compliance with the procedural rule impracticable, or attorney error rising to the level of ineffective assistance of counsel, or a factual or legal basis for a claim that was not reasonably available. *McCleskey v. Zant*, 499 U.S. 467, 493-94 (1991).

## III.  ANALYSIS

### A.  Nondisclosure of *Brady* Materials

Jalowiec contends the prosecution violated his rights under *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose evidence potentially favorable to him prior to trial. He contends the prosecution wrongly withheld evidence of prior inconsistent statements made to the police by various state witnesses as well as plea-agreement deals, grants of immunity, and other inducements given to such witnesses. In *Beuke v. Houk*, 537 F.3d 618, 633 (6th Cir. 2008), we summarized the requirements of *Brady* as follows:

> *Brady* requires the prosecution to disclose exculpatory and impeachment evidence that is "material either to guilt or to punishment." *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (quoting *Brady*, 373 U.S. at 87). "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682

(1985). A *Brady* violation has three elements: (1) the evidence "must be favorable to the accused, either because it is exculpatory, or because it is impeaching"; (2) the "evidence must have been suppressed by the state, either willfully or inadvertently"; and (3) "prejudice must have ensued." *Strickler,* 527 U.S. at 281-82.

The district court determined that Jalowiec had failed to properly present his *Brady* claim (Claim 20) to the state courts and concluded that the claim was procedurally defaulted and subject to dismissal. *Jalowiec*, 2008 WL 312655, at *32-33. Yet, "in an effort to promote judicial efficiency and preserve judicial resources," *id.* at *50, the court nonetheless addressed the merits of the claim, concluding ultimately that the prosecution ought to have disclosed some materials, but that its failure to do so was harmless error. *Id.* at *66-73.

### 1. *Procedural Default of Brady Claim*

The procedural history of Jalowiec's post-conviction relief efforts is convoluted and confused. To the extent Jalowiec's *Brady* claim is based on the prosecution's failure to disclose the agreement pursuant to which Michael Smith testified, the district court determined that the claim was presented to the state trial court in Jalowiec's Third Amended Petition for Post-conviction Relief (seventh claim for relief). *Id.* at *32-33. Observing that the Ohio Court of Appeals affirmed the dismissal of this claim as an improper successive petition (because the third amended petition succeeded an original petition and two subsequent amendments), the district court held that this ruling represented enforcement of an independent and adequate state procedural bar that foreclosed federal habeas review of the merits. Yet, inasmuch as Jalowiec's motion to strike his original petition and first two amendments was never addressed by the state courts—a point apparently overlooked by the Ohio Court of Appeals—there appears to be no good reason to treat the third amended petition as a successive petition, rather than as a permissible amendment of his original petition.[3] The Ohio courts' enforcement of the procedural bar was therefore, to this extent, erroneous and represents no obstacle to

---

[3]Although the timeliness of Jalowiec's original petition was once in question, counsel for the Warden conceded the point at oral argument.

our review of this portion of Jalowiec's *Brady* claim. *See Cone v. Bell*,  129 S.Ct. 1769, 1780-81 (2009) (holding that state court application of procedural bar resting on false premise creates no bar to habeas review of merits); *Richey v. Bradshaw*, 498 F.3d 344, 359-60 (6th Cir. 2007) (declining to find procedural default where  procedural bar was improperly enforced by state courts); *Durr v. Mitchell*, 487 F.3d 423, 434-35 (6th Cir. 2007) (holding that incorrect application of state procedural bar was not reliance on "adequate and independent" state rule).  We independently review this issue on the merits below.  *See* Part III.A.2(f).

To the extent the *Brady* claim is based on the prosecution's failure to disclose prior statements of Raymond Smith, Danny Smith, Terry Hopkins, Sandra Williams, Lynne Altpater and Tammie Green, the district court held that the claim was never presented to the state courts and is therefore unexhausted and unreviewable in habeas. *See* 28 U.S.C. § 2254(b) (making exhaustion of state-court remedies prerequisite to federal habeas relief ).  Jalowiec contends this ruling is in error.  First, he contends that although he did not specifically assert a *Brady* claim concerning the prosecution's nondisclosure of prior statements by these witnesses in his third amended petition, the petition did include, in his fourteenth claim for relief, allegations of fact implicating undisclosed statements by Raymond Smith, Michael Smith, Sandra Williams and Lynne Altpater.

Jalowiec thus impliedly argues that he adequately presented the "substance" of his *Brady* claim to the state courts to satisfy the exhaustion requirement.  *See Picard v. Connor*, 404 U.S. 270, 275-78 (1971); *Satterlee v. Wolfenbarger*, 453 F.3d 362, 365 (6th Cir. 2006).  Yet, because of the important federal-state comity concerns served by the exhaustion doctrine, a state prisoner is required to present the state courts with the same claim, or a claim "substantially equivalent" to the claim, urged upon the federal courts. *Picard*, 404 U.S. at 275-78. Otherwise, the state courts are not given the opportunity to apply the controlling legal principles to the facts bearing on the constitutional claim.  *Id.*

Jalowiec's fourteenth claim for relief asserted two different theories of relief, i.e., that the prosecution violated his due process right to a fair trial by suborning perjury, and

that his trial counsel's failure to conduct a more thorough pre-trial investigation amounted to ineffective assistance of counsel. Both of these theories of relief implicated prior statements made by prosecution witnesses, but neither gave the state courts the opportunity to apply the legal principles governing Jalowiec's present *Brady* claim. It is not enough that these different claims implicated some of the same facts that are integral to Jalowiec's *Brady* claim. *See Anderson v. Harless*, 459 U.S. 4, 6 (1982). It is not enough that the claims actually presented to the state courts were "somewhat similar" to the *Brady* claim in some respects. *Id.* Nor is it enough to say that the *Brady* "ramifications" of Jalowiec's arguments were "self-evident." *Id.* at 7. The bottom line is that the state courts were not called upon to apply the legal principles governing the constitutional claim now presented to the federal courts.

Accordingly, we find no error in the district court's conclusion that Jalowiec's *Brady* claim concerning the prosecution's nondisclosure of prior statements by these witnesses was not, by virtue of the claims asserted in the fourteenth claim for relief in his third amended petition, properly exhausted.

Jalowiec challenges the district court's lack-of-exhaustion ruling on a second basis. To the extent his *Brady* claim is based on suppressed evidence that remained undisclosed until after the habeas proceedings were commenced, he contends the exhaustion requirement should be excused. Indeed, inasmuch as Jalowiec's failure to timely assert certain bases for his *Brady* claim is shown to be attributable to the prosecution's wrongful withholding of information, he has good cause for his failure to exhaust. *See Rhines v. Weber*, 544 U.S. 269, 278 (2005). The Warden does not dispute that materials relevant to Jalowiec's *Brady* claim were disclosed only during discovery in the district court habeas proceedings. Jalowiec has therefore adequately shown "good cause." The challenge is to determine which items are relevant to the *Brady* violations asserted in Claim 20 and whether their non-disclosure is shown to have resulted in such "prejudice" as to render the claim sufficiently meritorious to warrant a stay of our review

pending completion of Jalowiec's state court exhaustion efforts.  *Id.* at 277; *Harris v. Lafler*, 553 F.3d 1028, 1031-32 (6th Cir. 2009).[4]

To satisfy the prejudice requirement, Jalowiec must show there is a reasonable probability that the outcome of the trial would have been different had the materials been timely disclosed to the defense.  *Strickler*, 527 U.S. at 289.   He must show that the withholding of  materials "worked to his actual and substantial disadvantage, infecting his entire trial with errors of constitutional dimensions."  *Beuke*, 537 F.3d at 634 (quoting *Jamison v. Collins*, 291 F.3d 380, 388 (6th Cir. 2002)).  This prejudice inquiry mirrors the *Brady* materiality analysis implicated by the merits of the claim.  *Id.*  We therefore look to the district court's assessment of the merits of Claim 20 as our starting point in determining whether Jalowiec has shown prejudice resulting from the nondisclosure of witness statements.  We also look to the district court's assessment of the merits in regard to Jalowiec's claim that the prosecution failed to disclose an agreement pursuant to which Michael Smith testified because that aspect of his claim was not procedurally defaulted.

### 2.  *Prejudice:  Materiality of Withheld Information*

Because the state courts did not address the merits of the *Brady* claim, we are not constrained by AEDPA deference; like the district court below, we undertake de novo review of materiality and prejudice.  *See Cone v. Bell*, 129 S.Ct. 1769, 1784 (2009).  Again, in order to make out a *Brady* violation, Jalowiec must show that (1) evidence favorable to the defense, (2) was suppressed by the government, and (3) the defense was prejudiced.  In determining whether "withheld information was material and therefore prejudicial," a reviewing court considers "it in light of the evidence available for trial that supports the petitioner's conviction."  *Jells v. Mitchell*, 538 F.3d 478, 502 (6th Cir.

---

[4]During the pendency of this appeal, Jalowiec has returned to state court and filed a motion for new trial based on the unexhausted part of his *Brady* claim.  The motion was filed in June 2008 and remains pending.  We have denied Jalowiec's request to hold proceedings in this appeal in abeyance pending final disposition of the unexhausted claim in the state courts.  Notwithstanding Jalowiec's failure to exhaust, we may address the claim on the merits and deny it if it lacks merit.  28 U.S.C. § 2254(b)(2).  The district court undertook thorough review of the merits and found Jalowiec's claim wanting.  For the reasons that follow, we reach the same conclusion.  Holding the case in abeyance pending complete exhaustion in the state courts would thus serve no useful purpose.

2008). "[E]vidence is 'material' within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cone*, 129 S.Ct. at 1783. "[A] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). Favorable evidence is material if it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Cone*, 129 S.Ct. at 1783 (quoting *Kyles*, 514 U.S. at 435). If materiality of the suppressed evidence is established, making out a *Brady* violation, harmless-error inquiry does not apply. *Kyles*, 514 U.S. at 435. In reviewing for materiality, we consider the effect of the suppressed evidence "collectively," rather than "item by item." *Cone*, 129 S.Ct. at 1785 (quoting *Kyles*, 514 U.S. at 436). Nonetheless, we begin, like the district court, by considering each item asserted in Claim 20 individually.

    (a) *Danny Smith*

    Danny Smith, one of the defendants (along with Raymond Smith) against whom Ronald Lally had been set to testify in connection with drug-trafficking charges just before he was killed, gave a recorded statement to police during custodial interrogation on January 7, 1995. Danny Smith told Elyria Police Detective Alan Leiby, investigating the Lally murder, that he "never really suspected of [sic] Stan [Jalowiec] would do something like that until everything started coming in and people start [sic] bringing up his name." This statement was not disclosed to Jalowiec prior to or at the time of his trial. Although Danny Smith, as a suspected co-conspirator, was "unavailable" to testify at Jalowiec's trial, Jalowiec argues the statement should have been disclosed as *Brady* material because it tended to exonerate him, refuting the prosecution's theory that he was involved in a suspected conspiracy to kill Lally. The district court summarily held that Danny Smith's January 7, 1995 statement was "material" because, had it "been disclosed prior to trial or at trial, the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Jalowiec*, 2008 WL 312655, at *67. However, the court ultimately concluded that this "*Brady*

violation," viewed in light of all the evidence implicating Jalowiec, was harmless beyond a reasonable doubt. *Id.* at *73.

On appeal, Jalowiec correctly contends the district court's reasoning is self-contradictory. He contends the district court, having once found that the statement was "material," and its nondisclosure a "*Brady* violation," was not at liberty to engage in harmless-error review to deny habeas relief. Indeed, the district court expressly recognized earlier in its opinion that "once a *Brady* violation is found, there is no need for further harmless-error review[;] . . . [a] *Brady* violation is never harmless." *Id.* at *67 (citations omitted). The Warden does not deny the facial inconsistency. However, in view of the court's unambiguous denial of habeas relief, the Warden contends the opinion should be construed as concluding that Danny Smith's statement was potentially exculpatory and *should* have been disclosed per *Brady*, but was not, ultimately, "material."

The Warden's position finds support not only in a common-sense reading of the opinion as a whole, but also in the Supreme Court's recognition that "not every violation of [the prosecution's duty of disclosure] necessarily establishes that the outcome was unjust." *Strickler*, 527 U.S. at 281. As the *Strickler* Court further observed:

> [T]he term "*Brady* violation" is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence—that is, to any suppression of so-called "*Brady* material"—although, strictly speaking, there is never a real "*Brady* violation" unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict.

*Id.* Consistent with this observation, we read the district court's opinion, despite its misleading language, as concluding that the prosecution breached its duty of disclosure under *Brady*, but that the Danny Smith statement was not so "material" that its timely disclosure to the defense would have given rise to a reasonable probability of a different verdict.

This is a conclusion that we also reach de novo. We find no error in the district court's determination that the January 7, 1995 statement should have been disclosed.

Yet, the statement is arguably as incriminating as it is exculpatory. Jalowiec has not demonstrated—even assuming he could have found a way of introducing Danny Smith's hearsay opinion about a friend's character—that he could have made such effective use of it as would put the whole case in such a different light as to undermine confidence in the verdict. Nor has he explained how the statement might have led to other admissible exculpatory evidence. The statement is therefore not "material" for *Brady* purposes, and its nondisclosure was not so prejudicial as to amount to a "*Brady* violation."

In addition to the January 7, 1995 statement, the prosecution withheld recorded conversations between Danny Smith and prosecution witness Carl Hartman in which Danny attempted to bribe Hartman and influence him as a witness. Jalowiec contends that Danny's statements could have been used to cross-examine Hartman and to undermine the prosecution's theory that Jalowiec conspired to kill Lally by tending to show Danny Smith's greater involvement and culpability. The district court held this evidence was neither exculpatory nor material. *Jalowiec*, 2008 WL 312655 at *68. On appeal, Jalowiec has failed to demonstrate that the district court erred in either respect. Jalowiec has not demonstrated *how* he could have effectively used such evidence of Danny Smith's efforts to influence Hartman to undermine confidence in the jury's assessment of the evidence against him.

(b) *Terry Hopkins*

Terry Hopkins was staying in an apartment with Danny Smith at the time of the Lally murder. He was out drinking with Danny Smith and others in the early morning hours on the day of the murder, January 19, 1994. He gave inconsistent recorded statements to officers on January 4 and 6, 1995, concerning conversations he had with Danny Smith, Raymond Smith and Jalowiec in the hours after the murder. Although Hopkins first stated that Jalowiec admitted shooting Lally, he later stated that Jalowiec identified Raymond Smith as the shooter. The district court concluded that these statements should have been provided to Jalowiec, but that they were not material because Hopkins also made various inconsistent statements at trial and was subject to effective cross-examination. *Jalowiec*, 2008 WL 312655, at *68.

We find no error in the district court's assessment. On cross-examination, Hopkins readily admitted that he gave multiple statements to the police. He acknowledged that he was not very cooperative on one occasion because he "didn't want to get involved." He did not deny that he subsequently gave a "revised" statement. Hopkins seemed unable to remember when he gave specific statements to the police. He admitted he had drunk heavily the night Lally was killed and was "pretty drunk" when he heard the conversations he reported on. Thus, it is apparent that even without the benefit of specific inconsistent statements from undisclosed police interviews, Jalowiec's counsel managed to effectively cross-examine Hopkins, highlighting weaknesses in his testimony. Although we agree with the district court's determination that Hopkins' prior inconsistent statements should have been disclosed, Jalowiec has not demonstrated that his efforts to impeach Hopkins would have been so significantly aided by the statements as to create a reasonable probability that the outcome of the trial would have been different. The nondisclosure of these statements was therefore not material under *Brady*.

(c) *Lynne Altpater*

Lynne Altpater was an acquaintance of Jalowiec and Danny Smith who testified for the prosecution in Jalowiec's trial. She testified that she was working at a doctor's office in December 1993 when Danny Smith approached her and asked if she could get him some poison to "take care of a person" who could cause him to be in a lot of trouble. She had previously given recorded statements to the police on January 6, 1995 and January 19, 1995—statements that were not disclosed to the defense. Her testimony was consistent with her prior statement of January 19, but inconsistent with her January 6 statement, when she told Detective Leiby that Danny Smith wanted the poison to kill some cats that had crawled on his car at work. Although Jalowiec could have used the January 6 version as a prior inconsistent statement to impeach Altpater, the district court concluded that the statement was not material for *Brady* purposes. The court reasoned that Altpater's testimony was not that damaging to Jalowiec, considering (a) there was

no evidence that he was privy to the conversation between Altpater and Danny, and (b) "poison was not used to kill Lally." *Jalowiec*, 2008 WL 312655, at \*69.

We find no error in this assessment. Altpater's testimony was useful to the prosecution to show that Danny Smith, one of the persons Jalowiec was suspected of conspiring with, had explored at least one other way of preventing Lally from testifying against him and his father on the then pending drug-trafficking charges. Otherwise, it had no tendency to incriminate Jalowiec. Further, even if Jalowiec could have used the January 6 statement to attack Altpater's credibility, the prosecution could have used the January 19 statement to rehabilitate her by showing that Altpater had gradually become more cooperative and forthcoming. Considering the broader context, the January 6, 1995 statement was not so material as to warrant a finding that its disclosure to the defense would have made a difference.

Jalowiec asserts a second *Brady* violation in relation to witness Altpater. At Danny Smith's trial, subsequent to Jalowiec's, prosecution witness Lynne Altpater testified that Detective Leiby had offered her husband, Richard Altpater, assistance with drug charges pending against him in exchange for his cooperation with the prosecution of Danny Smith. That is, according to a statement recorded by attorney Michael Duff on October 23, 1995, Richard Altpater said Detective Leiby asked him to corroborate information obtained from other witnesses to the effect that Danny Smith had offered him, Richard Altpater, money to kill a person or take him out of town. Richard Altpater purportedly told Leiby he would cooperate, even though, in truth, Danny Smith had not offered him money, but had only asked if he knew anyone who could hurt someone for money. In his recorded statement, Richard Altpater went on to explain that he "used to whoop people's ass for money," but that he's "getting too old for that." As it turned out, Richard Altpater was not called to testify and Leiby did not provide assistance with Richard Altpater's pending charges. Nonetheless, Jalowiec argues that the prosecution should have disclosed evidence of Leiby's offer to induce Richard's cooperation for his use in impeaching Lynne Altpater's testimony in his trial. The district court held that information relating to Leiby's offer should have been disclosed to Jalowiec, but that the

nondisclosure did not result in cognizable prejudice.  *Jalowiec*, 2008 WL 312655, at *72-73.

Although the district court carelessly referred to the nondisclosure of the information as a "*Brady* violation," Jalowiec has not otherwise demonstrated error by the district court.  Jalowiec has failed to identify evidence that Lynne Altpater's testimony in his case was actually induced or influenced by any promise or offer of assistance with her husband's charges.  Even though she actively participated in the statement recorded on October 23, 1995, the statement includes no suggestion that she was influenced by Leiby's offer to her husband.  Moreover, as indicated above,  Lynne Altpater's testimony in Jalowiec's trial about Danny Smith's request for poison—irrespective of whether he couched his request in terms of a need to kill a cat or a person—was of marginal relevance in establishing Jalowiec's guilt.  There is no reasonable basis to conclude that the disclosure of Leiby's offer would have affected the verdict.

     (d)  *Joann Fike*

Joann Fike was the owner of the Chrysler LeBaron that Jalowiec borrowed on the night of Lally's murder.  She testified for the prosecution that her nephew Brian Howington let Jalowiec borrow the car, and that it was covered with ice and had blood on it when Jalowiec and Raymond Smith returned it several hours later.  After the LeBaron was impounded in connection with the murder investigation, Detective Leiby helped Joann Fike find another car, gave her $200 for a set of four tires, and helped her obtain the car's return.  Jalowiec contends Leiby's help represents evidence that he induced Fike's cooperation, evidence that should have been disclosed.  The district court acknowledged that the help Leiby gave may or may not have been usual protocol, but concluded that this information should have been disclosed to Jalowiec. *Jalowiec*, 2008 WL 312655, at *73.  Nonetheless, the district court concluded the error was "harmless." *Id.*

Jalowiec argues that any inducement given to Fike was important because she was a key witness who placed Jalowiec in her car on the night of the homicide.  The

Warden concedes that the economic consideration Fike received was relevant to her credibility, but argues that the evidence would not have altered the outcome of the trial if it had been given to the defense. We agree. Fike's testimony was corroborated by other witnesses. There is no good reason to question her credibility. Even though the evidence of help Fike received should have been disclosed, Jalowiec has presented no reason to believe the information could have been used to so impeach Fike as to call the fairness of the trial and its outcome into question.

We also find no error in the district court's determination that evidence that Fike was granted transactional immunity in exchange for her cooperation with the investigation of Lally's death was not material for purposes of *Brady*. Again, the grant of immunity should have been disclosed, but inasmuch as Fike did not reveal any self-incriminating information, the impeachment value of the immunity agreement was minimal. *See Marshall v. Hendricks*, 307 F.3d 36, 56 (3d Cir. 2002) (recognizing that "the impeachment value of the immunity agreement is inextricably tied to the self-incriminating evidence that was provided after the immunity agreement was executed.").

(e) *Sharon Hopkins*

Jalowiec contends the prosecution withheld evidence that Sharon Hopkins's testimony was induced by Detective Leiby's having obtained a signature bond for her boyfriend after he turned himself in on misdemeanor warrants. The district court concluded that this information was not material because the charges were minor and the boyfriend would have "more than likely" obtained a bond without Leiby's help. *Jalowiec*, 2008 WL 312655, at *72.

Sharon Hopkins's testimony was important to the prosecution. She corroborated Michael Smith's description of the transfer of passengers (Raymond and Michael Smith) from Danny Smith's car to Fike's LeBaron (containing Jalowiec and Lally) in the middle of the night, a transfer that linked Howington's and Fike's testimony about the LeBaron and linked Jalowiec to Lally throughout the night. Although the prosecution improperly withheld the information that Leiby assisted Hopkins's boyfriend, we affirm the district court's assessment that the information would not have undermined confidence in the

outcome if it had been made available to Jalowiec. Considering that the benefit accrued to a boyfriend and not Sharon Hopkins herself, that minor charges were involved, and that Jalowiec has not disputed that the boyfriend might well have received the bond regardless of Leiby's intercession, Jalowiec has not shown that the information was material under *Brady*.

(f) *Michael Smith*

Michael Smith was the prosecution's star witness. Jalowiec contends that the prosecution withheld: evidence that Michael called Detective Leiby in 1993 or 1994 and tried to take the blame for the drug charges then pending against Danny Smith and implied that he might "do something" when Leiby rejected his story; evidence that Michael called Leiby in February 1996 and told him that he knew nothing about a conspiracy between Danny and Raymond Smith relating to Lally; and comments in police files reflecting belief that Michael had a "violent nature." Jalowiec also contends the prosecution withheld information suggesting a connection between Michael's testimony against Jalowiec and lenient sentencing treatment Michael received on an unrelated offense.

The district court discounted the supposedly withheld information that Michael Smith had been granted favorable treatment in exchange for his testimony at Jalowiec's trial. *See Jalowiec*, 2008 WL 312655, at *72. The court noted that on November 22, 1994—long before Jalowiec's trial—Michael was given shock probation on a five-to-fifteen-year prison sentence for a crime unrelated to the events of Jalowiec's case. Then, after Michael testified, he received an early discharge from probation. *Id.* The district court correctly found there was no evidence, only speculation, linking the two.

Further, as the district court determined, *id.* at *69, Michael Smith's telephonic denial of knowledge of any conspiracy between his brother and father was completely consistent with his trial testimony, in which he expressed shock and surprise at what was happening during the early morning hours of January 19, 1994. The statement thus had little if any impeachment value and was not otherwise exculpatory of Jalowiec. Similarly, the cited comments about Michael's suspected violent nature were

unsubstantiated and, even if admissible, bore little if any exculpatory or impeachment significance.  They can hardly be considered material under *Brady*.

(g)  *Tammy Green (Castro)*

Jalowiec contends that Tammy Green, Danny Smith's girlfriend, was given transactional immunity for her grand jury testimony and that this fact was not disclosed to the defense.   The district court correctly concluded that, even if Tammy Green was given immunity for her grand jury testimony, the prosecution was under no obligation to disclose it because she did not testify at Jalowiec's trial. *Jalowiec*, 2008 WL 312655, at *72 (citing *United States v. Mullins*, 22 F.3d 1365, 1372 (6th Cir. 1994) (observing that because the prosecution did not call the agreement's beneficiary as a witness at trial, "there was no one to impeach.")).

Further, Jalowiec maintains that Green's grand jury testimony was contrary to Sharon Hopkins's trial testimony and that he could have used it to impeach Hopkins if it had been disclosed to him.  The district court reasoned that the prosecution had no duty to disclose the grand jury testimony, despite its potential impeachment value, because there is no showing that Jalowiec could not have obtained Green's story from her directly and called her as a witness. *Id.* (citing *Carter v. Bell*, 218 F.3d  581, 601 (6th Cir. 2000) (holding there was no *Brady* violation where the defendant should have known of the information and it was available from another source)). *See also Doan v. Carter*, 548 F.3d 449, 460 (6th Cir. 2008) (same).

On appeal, Jalowiec argues the district court's reasoning is flawed.  He contends he had no reason to know Green's version of the events on January 19, 1994 was different than Sharon Hopkins's and Michael Smith's.  Yet, Green's presence among those involved in the events of January 19 was attested to by others.  Her recollection of the events should have been readily discoverable with minimal investigation by defense counsel.  Under such circumstances, "the *Brady* rule does not assist a defendant who is aware of essential facts that would allow him to take advantage of the exculpatory evidence at issue," such as when the evidence in question "would have been discoverable with minimal investigation by [defense] counsel." *Coleman v. Mitchell*,

268 F.3d 417, 438 (6th Cir. 2001); *see also Benge v. Johnson*, 474 F.3d 236, 243 (6th Cir. 2007).

Moreover, in her grand jury testimony, Green testified not only that she did not know who Sharon Hopkins was, but also that Michael Smith was not in the car with her and Danny that night. She also stated that she did not see Fike's LeBaron that night. Her version of events before she and Danny and Raymond and Jalowiec parted ways on January 19, read in isolation, would have assisted Jalowiec's defense insofar as it contradicted the testimony of two prosecution witnesses on some background details. Generally, however, Green made clear her unwillingness to get involved. She admitted that she wanted to remain "willfully ignorant" of Danny's criminal activities. Hence, even if the prosecution ought to have disclosed the substance of her grand jury testimony, it is unlikely that the account of such a reluctant witness would have effectively impeached the testimony of Michael Smith and Sharon Hopkins. Accordingly, we find no error in the district court's ruling.

(h) *Alternate-Suspects Evidence*

Jalowiec contends that the prosecution withheld "significant, credible evidence regarding alternate suspects—suspects who actually had a motive to kill Lally." Jalowiec identifies several trial witnesses, including all three Smiths, Terry Hopkins, and Vernard Berry, who, unlike him, were "involved in the drug world." Jalowiec also refers to an undisclosed transcript of a November 29, 1995 interview with a Melissa Arroyo, who told officers that Danny Smith had told her that he, Danny, had killed Lally. Finally, Jalowiec refers to several potential suspects named in various police reports as being close to Danny Smith or having involvement with Lally.

These bases for Jalowiec's *Brady* claim were not asserted in his amended habeas petition, but only in his traverse. It is apparently for this reason that the district court properly declined to address these asserted grounds for relief. *See Tyler v. Mitchell*, 416 F.3d 500, 504 (6th Cir. 2005) (holding that district court did not err in declining to address claim first raised in traverse rather than in habeas petition). Even if we were to find these grounds properly presented, they would be unavailing. Jalowiec's

identification of trial witnesses as "alternate suspects" is based largely on their trial testimony and is not undisclosed *Brady* evidence at all. Further, the mere fact that these witnesses were allegedly "involved in the drug world" is insufficient to render them "suspects" in Lally's murder. According to Melissa Arroyo's statement, Danny Smith told her that he killed somebody in "the fall season;" that "they beat the crap out of him and then um, they tied his feet to the bumper and they drove him up and down the street, and then they ran him over." Danny did not tell her who the person was and she had no idea whether Danny was referring to Lally. Although this statement might be deemed *Brady* material, Jalowiec has not shown how it could have been used, in view of the other trial evidence, to call the integrity of the verdict into question. The remaining alternate-suspects "evidence" Jalowiec cites is so vague or peripheral to the facts of the Lally murder that it can hardly be deemed exculpatory, much less material.

### (i) *Jailhouse Informant Evidence*

Jalowiec contends that the prosecution revealed only after trial that Detective Leiby had arranged for the placement of "snitches," including Danny Smith, in his pre-trial cell "in a vain attempt to procure admissions." He contends that he made no incriminating statements and that he should have been able to use this information at trial to discredit the prosecution. This theory of relief was not asserted in Jalowiec's petition either, but only in his traverse. It was not addressed by the district court and is not properly before us. *See Tyler*, 416 F.3d at 504. The claim is patently meritless in any event because Jalowiec has offered no rationale whereby his asserted silence or failure to make an incriminating statement could be deemed exculpatory "evidence" that the prosecution was obliged to disclose under *Brady*.

### (j) *Sentencing Evidence*

In support of his claim that the prosecution violated his *Brady* rights at sentencing, Jalowiec cites an undisclosed police report showing that prosecution witness Jeff Hicks gave inaccurate testimony in the penalty phase. In his testimony, Hicks said that as he left a bar in Elyria on the night of January 27-28, 1994, he was struck by Jalowiec "with a bat, fist, or some type of club," that he was knocked out, and that,

according to a friend, Jalowiec kicked him in the face while he was unconscious. This account differed from the statement he made to the police two days after the assault only in that Hicks then reported that as he exited the bar, he was "either pushed, or fell to the ground, and passed out" before Jalowiec kicked him in the face, fracturing his jaw. Nonetheless, the police report shows that the focus of the ensuing investigation was on Jalowiec's having kicked Hicks in the face while he lay unconscious and defenseless.

The district court concluded that the police report could "not reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Jalowiec*, 2008 WL 312655, at \*70. This handling of the Hicks evidence was clearly appropriate. The most damning aspect of Hicks's sentencing testimony was not so much the manner in which he was initially knocked out, but that Jalowiec kicked him in the face and fractured his jaw while he was lying defenseless on the ground. Given that Hicks's testimony suggested that he was "blindsided," and that the police report indicated Hicks did not know how he fell unconscious to the ground, the police report would have had little impeachment value to Jalowiec and can hardly be deemed material under *Brady*.

(k) *Materiality of Withheld Information: Conclusion*

Accordingly, we hold that none of the allegedly suppressed items of information is so "material" for *Brady* purposes as to give rise to a reasonable probability that the outcome of the trial would have been different if it had been disclosed to Jalowiec prior to trial. In assessing materiality, however, we must consider the effect of the suppressed evidence "collectively." *Cone*, 129 S.Ct. at 1785. The sheer number of undisclosed, potentially exculpatory items in this case suggests a troubling disregard by the prosecution of its *Brady* obligation, which we do not condone. Our role on habeas review, however, is not to police the prosecution, but to ascertain whether the prosecution's failure to disclose *Brady* material compromised Jalowiec's right to a fair trial.

Almost all of the undisclosed information identified by Jalowiec has potential impeachment value; it is not directly exculpatory. Exculpatory evidence is not

inherently more valuable, because the *Brady* materiality prong is not a sufficiency-of-the-evidence test, but there are relevant distinctions between impeachment and exculpatory evidence for *Brady* purposes.  For instance, "[w]here the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or who is subject to extensive attack by reason of other evidence, the undisclosed evidence may be cumulative, and hence not material." *Robinson v. Mills*, 592 F.3d 730, 736 (6th Cir. 2010) (internal quotation marks omitted).

Defense counsel thoroughly cross-examined several of the prosecution witnesses who are the subjects of *Brady* impeachment evidence in this case.  Weaknesses and inconsistencies in the prosecution's case were exposed.  The jury was well aware that most of the prosecution witnesses were not model citizens and many were under the influence of intoxicants at the time of the events they testified about.  The undisclosed evidence Jalowiec relies on could have been used to further impugn the credibility of some witnesses, but most of the potentially impeaching evidence was of marginal significance.  It could hardly have been used to undermine the prosecution's core showing of Jalowiec's guilt.

The ultimate question is whether there is a reasonable probability that the disclosure of such evidence, cumulatively, would have put the whole case in such a different light as to undermine confidence in the verdict.  Evidence withheld by the prosecution "must be evaluated in the context of the entire record." *United States v. Agurs*, 427 U.S. 97, 112 (1976).  "If there is no reasonable doubt about guilt whether or not the additional evi[de]nce is considered, there is no justification for a new trial." *Id.* at 112-13.  Because the evidence as a whole reflects that most of the trial witnesses were thoroughly and effectively cross-examined, the undisclosed impeachment evidence would have been of marginal value to Jalowiec. It follows that Jalowiec has failed to establish a reasonable probability that the outcome of the case would have been different, even if all the additional impeachment evidence had been disclosed to the defense.

In reaching this conclusion, we hold that Jalowiec has not shown such prejudice as to render the unexhausted part of his *Brady* claim sufficiently meritorious to warrant a stay pending completion of his state court exhaustion efforts. Further, on de novo review of the merits of the claim, we hold that Jalowiec has not shown that the undisclosed impeachment evidence is sufficiently "material" to warrant habeas relief. We therefore affirm the district court's denial of Claim 20.

**B.  Ineffective Assistance of Counsel:  Counsel's Conflict of Interest**

Jalowiec contends in Claim 31 that he was denied effective assistance of counsel because his trial counsel, Joseph Grunda, was burdened by a conflict of interest. Jalowiec alleges that Grunda "concurrently" represented Terry Hopkins, and obtained a sentence reduction for him in an unrelated case in return for Hopkins's agreement to testify against Jalowiec. Jalowiec argues that Hopkins was a "critical" witness who testified to Jalowiec's own admissions that he was involved in Lally's murder. Although Hopkins was subject to cross-examination by Grunda's co-counsel, Jalowiec contends the cross-examination was ineffective to purge the adverse effects of the conflict. The Warden insists that attorney Grunda could not have been hampered by any divided loyalties because Hopkins received his sentencing benefit months before Jalowiec's trial began. Further, the Warden argues, Jalowiec was not prejudiced because the sentencing benefit Hopkins received was disclosed to Jalowiec's jury.

The district court deemed this conflict-of-interest claim procedurally defaulted, even though it was asserted in Jalowiec's third amended petition, because the state courts dismissed the third amended petition as a successive petition. *Jalowiec*, 2008 WL 312655, at *38. For the reasons set forth above, we disagree. The Ohio Court of Appeals' enforcement of this procedural bar was erroneous. It therefore represents no bar to habeas review of the merits of Jalowiec's claim. *See Cone v. Bell*, 129 S.Ct. at 1780-81 (holding that state court application of procedural bar resting on false premise created no bar to habeas review of merits).

In its alternative line of reasoning, the district court denied this claim on the merits. The court concluded that Jalowiec (1) failed to show a *quid pro quo* relation

between the lenient sentencing treatment Hopkins received and his testimony against Jalowiec; and (2) failed to show that attorney Grunda's prior representation of Hopkins had any adverse effect on his representation of Jalowiec. *Jalowiec*, 2008 WL at 312655, at *59, 89.

Ordinarily, to prevail on an ineffective-assistance-of-counsel claim, a petitioner must show that his counsel's performance was deficient and that the deficiency so prejudiced his defense that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984). However, prejudice is presumed if counsel is shown to have been burdened by an actual conflict of interest. *Id.* at 692 (citing *Cuyler v. Sullivan*, 446 U.S. 335, 345-50 (1980)). Yet, even in the case of such a conflict of interest, "[p]rejudice is presumed only if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.'" *Id.* (quoting *Sullivan*, 446 U.S. at 350).

In *Stewart v. Wolfenbarger*, 468 F.3d 338, 350 (6th Cir. 2006), we noted that the Supreme Court has thus far applied the *Sullivan* prejudice presumption only in the case of a conflict of interest arising from multiple *concurrent* representation of defendants, and has left open the question whether the presumption could apply in the case of a conflict arising from *successive* representation. *Id.* (citing *Mickens v. Taylor*, 535 U.S. 162, 175-76 (2002)). Multiple concurrent representation, also referred to as joint or dual representation, occurs where a single attorney simultaneously represents two or more co-defendants in the same or separate proceeding(s), whereas successive representation occurs where defense counsel has previously represented a co-defendant or trial witness. *Moss v. United States*, 323 F.3d 445, 455, 459 (6th Cir. 2003).

In *Moss*, the applicability of the *Sullivan* presumption was considered in the case of "an atypical form of successive representation." *Stewart*, 468 F.3d at 351 (citing *Moss*, 323 F.3d at 462-63). Among the unique circumstances considered in *Moss* were the facts that (a) the same attorney represented defendant Moss in pre-indictment proceedings, but represented Moss's co-defendant in all post-indictment proceedings;

(b) the two co-defendants were tried together and collaborated in the defense; and (c) defendant Moss paid for his co-defendant's legal representation. *See id.* The *Moss* court determined that counsel's "successive and intertwining representations" created a conflict of interest, satisfying the first prong of the *Sullivan* standard. *Id.* at 465. Subsequently, the *Stewart* court took pains to limit the reach of *Moss* to its unique facts, noting that later Sixth Circuit rulings have declined to apply the *Sullivan* presumption in cases of successive representation. *Id.* (citing *Gillard v. Mitchell*, 445 F.3d 883, 891 (6th Cir. 2006); *Lordi v. Ishee*, 384 F.3d 189, 193 (6th Cir. 2005)). Hence, a threshold question posed by Jalowiec's claim is whether attorney Grunda's representation of Terry Hopkins, followed by his representation of Jalowiec, bore indicia of multiple-concurrent representation, triggering consideration of the *Sullivan* standard, or rather was more akin to typical successive representation that did not pose an actual conflict of interest.

Hopkins was represented by Grunda in the Lorain County Common Pleas Court when he pleaded guilty in October 1994 to several offenses (attempted aggravated burglary, attempted felonious assault, domestic violence, and criminal damage) unrelated to the charges later brought against Jalowiec. Hopkins first implicated Jalowiec in Lally's murder in statements given to the police in early January 1995. Later that month Hopkins was sentenced by Judge Kosma J. Glavas to concurrent prison terms of five to fifteen years, three to ten years, six months, and ninety days. Jalowiec was indicted on capital murder charges in March 1995. This case, too, was assigned to Judge Glavas. Attorneys Joseph Grunda and Edward Cleary were appointed to represent Jalowiec. In August 1995, Grunda filed a motion on behalf of Hopkins to place him on "shock probation" and suspend his prison sentence. The motion set forth seven grounds for relief, but did not refer to any agreement by Hopkins to cooperate with authorities in the

investigation and prosecution of Jalowiec.[5] Judge Glavas granted the motion one month later. Hopkins was released from prison after serving less than eight months.

Hopkins testified for the prosecution in Jalowiec's trial in March 1996. Although Grunda had apparently not disclosed his prior representation of Hopkins to Jalowiec, cross-examination of Hopkins was conducted by co-counsel Edward Cleary. During cross-examination, Cleary asked Hopkins about the circumstances leading to the grant of shock probation. Hopkins stated that no promises were made, but Detective Leiby told him, even before he was sentenced, that if he gave a statement, Leiby "would see what could be done about getting [him] probation." Hopkins insisted his statement "was not in exchange for nothing." Hopkins explained that he gave his statement to Leiby before he was sentenced in January 1995. He was then sentenced to prison. After he had served six months' imprisonment, the statutory prerequisite to a motion for shock probation, attorney Grunda filed the motion on his behalf. Hopkins said he did not know whether Leiby supported the motion.[6] Hopkins testified that he was not required to testify for the prosecution in the Jalowiec case as a condition of probation.

Jalowiec contends that Grunda's representation of Hopkins was concurrent with, rather than successive to, Grunda's representation of him. He maintains this claim is thus subject to analysis under *Cuyler v. Sullivan* and that *Strickland* prejudice is presumed. Indeed, Grunda's representation of the two overlapped for several months. Grunda's representation of Hopkins appears to have been all but concluded at the time of his sentencing in January 1995. However, Grunda had been representing Jalowiec for five months when he filed the motion for shock probation on behalf of Hopkins in

---

[5] The motion asserted the following seven factors as warranting shock probation: (1) the offense was the result of circumstances unlikely to recur; (2) the victim of the offense induced or facilitated it (i.e., the offender found his girlfriend and mother of his child in bed with another man); (3) there are substantial grounds tending to excuse or justify the offense; (4) the offender acted under strong provocation; (5) the offender has no history of delinquency or criminal activity; (6) the offender is likely to respond quickly to correctional or rehabilitative treatment; and (7) the offender is likely to respond affirmatively to any "diversion" incorporated into the probation order. J.A. vol. IV, pp. 1557-58.

[6] When Detective Leiby testified in Jalowiec's trial, he confirmed that he spoke with Judge Glavas when the motion for shock probation was filed. Leiby advised Judge Glavas that Hopkins might be a witness in a case, and said he would appreciate "any consideration" if the judge felt Hopkins was a good candidate for probation. Leiby also noted that Hopkins's attorney was not present during these conversations.

August 1995. This appears to have been Grunda's final act in representing Hopkins, coming eight months after Hopkins's sentencing. The filing of this motion was consistent with the "consideration" offered by Leiby when Hopkins first made a statement in January 1995 implicating Jalowiec in the Lally murder. In other words, Grunda's last act on behalf of his first client, Hopkins, had some relation to the prosecution—and thus also to the defense—of his second client, Jalowiec, whose trial would commence seven months later. Grunda simultaneously represented both clients at a time when his representation of the one potentially touched on his representation of the other.

These facts do not make out the classic sort of multiple concurrent representation of co-defendants in the same criminal prosecution that was addressed in *Sullivan*. But neither was Grunda's representation of Hopkins and Jalowiec strictly successive either. Despite the fact that Jalowiec and Hopkins were not co-defendants, Grunda's temporarily overlapping representation of them in two factually unrelated matters nonetheless arguably posed some concerns akin to those identified in cases where the first prong of the *Sullivan* standard was deemed satisfied.

But we need not decide whether the fact pattern here is closer to a traditional case of multiple concurrent representation or to a typical case of successive representation, because the ultimate outcome of our analysis would be the same irrespective of how we characterized the representation. Recall that in *Sullivan* the Court held that *Strickland* prejudice is presumed where counsel was burdened by an actual conflict of interest, but "only if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.'" *Strickland*, 466 U.S. at 692 (quoting *Sullivan*, 446 U.S. at 350). In *Mickens*, the Court explained that "the *Sullivan* standard is not properly read as requiring inquiry into actual conflict as something separate and apart from adverse effect." *Mickens*, 535 U.S. at 172 n.5. Rather, "[a]n 'actual conflict,' for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance." *Id*. Thus, even though the *Moss* court held that counsel's successive representation of the

co-defendants triggered application of the *Sullivan* standard, it did not simply hold that *Strickland* prejudice was presumed. The court went on to ascertain whether an "actual conflict" *and* "adverse effect" had been shown. *See Moss*, 323 F.3d at 463-70.

To meet this standard, the petitioner had to show that "counsel was influenced in his basic strategic decisions by the interests of the former client." *Moss*, 323 F.3d at 466 (quoting *Wheat v. United States*, 486 U.S. 153, 160 (1988)). That is, the petitioner had to show that his attorney "made a choice between possible alternative courses of action, such as eliciting (or failing to elicit) evidence helpful to one client but harmful to the other." *Id.* (quoting *Thomas v. Foltz*, 818 F.2d 476, 481 (6th Cir. 1987); *see also Boykin*, 541 F.3d at 644. Because the "adverse effect" prong of this standard was not met in *Moss*, the *Sullivan* presumption of prejudice was not applied after all. Neither has Jalowiec satisfied this adverse effect requirement here.

The existence of an adverse effect is "more likely to be evident in cases in which an attorney takes positive steps on behalf of one client prejudicial to another than in cases in which the attorney's actions are based on inaction and are passive." *McFarland v. Yukins*, 356 F.3d 688, 706 (6th Cir. 2004) (quoting *United States v. Gambino*, 864 F.2d 1064, 1070 (3d Cir. 1988)). Here, Grunda took a "positive step" on behalf of Terry Hopkins when he applied for shock probation for Hopkins. This step was allegedly prejudicial to Jalowiec insofar as the grant of shock probation may have influenced Hopkins to testify in Jalowiec's trial. Yet, Hopkins had made statements to the police incriminating Jalowiec months before Grunda began representing Jalowiec and months before the motion for probation was filed. Further, there is no evidence that the grant of probation influenced Hopkins's decision to testify in Jalowiec's trial. The motion for probation did not mention this as a factor and Hopkins specifically denied that agreeing to testify was a condition of probation. The notion that Hopkins would not have testified but for the grant of probation is purely speculative.

Jalowiec's contention that the conflict of interest induced a more "passive" cross-examination of Hopkins is also unsupported. Cleary cross-examined Hopkins specifically about the role the grant of probation had on his testimony. Cleary also cross-

examined Detective Leiby on the subject.   Because of this cross-examination, the *implication* that the grant of probation may have influenced Hopkins to testify cannot have been lost on the jury.   Hence, Jalowiec has failed to demonstrate that attorney Grunda was burdened by a conflict of interest that adversely affected his representation.

It follows then, consistent with the holdings of both *Moss* and *Stewart*, that the *Sullivan* presumption of prejudice is not applicable.  Nor has Jalowiec otherwise shown, as ordinarily required under *Strickland*, that any conflict of interest contributed to such deficiencies in Grunda's performance that there is a reasonable probability that, but for the deficiencies, the outcome of the trial would have been different.  We thus affirm the district court's denial of relief on the Claim 31 ineffective-assistance-of-counsel claim.

### C.   Ineffective Assistance of Counsel:  Penalty Phase Hearsay

Jalowiec contends in Claim 35(d) of his amended habeas petition that trial counsel performed ineffectively at the penalty phase by failing to object to the admission of two recorded telephone conversations between Raymond Smith and Detective Leiby. The conversations included statements by Raymond Smith implicating Jalowiec in Lally's murder.   The Ohio Supreme Court concluded on direct review that the tapes were inadmissible hearsay, but that their admission was harmless. *State v. Jalowiec*, 744 N.E.2d 163, 178 (Ohio 2001).  Consequently, counsel's failure to object to the admission of the statements was deemed not to have resulted in *Strickland* prejudice.   *Id*. at 179. The district court concurred in this determination. *Jalowiec*, 2008 WL 312655, at *54, 105-08.

It is undisputed that this ineffective-assistance claim was exhausted in the state courts and properly preserved for habeas review.  Our review is therefore limited under AEDPA.  *See* 28 U.S.C. § 2254(d)(1).   Jalowiec contends the Ohio Supreme Court's holding that counsel's error did not result in prejudice is contrary to or an unreasonable application of *Strickland*.

In a taped telephone conversation with Detective  Leiby on July 5, 1995, Raymond Smith told Leiby that Jalowiec was the other person with him in the cemetery

when Lally was killed.   The tape was introduced during the penalty-phase testimony of Detective Leiby, who was put on the stand to rebut Jalowiec's claim during his unsworn statement that he was not involved in Lally's murder.  During his statement, Jalowiec had asserted that "he had no reason to kill that man" and that Leiby had "set him up."

When this hearsay evidence was admitted, the jury had already found Jalowiec guilty of Lally's murder beyond a reasonable doubt.  The tape was not admitted as substantive evidence of Jalowiec's guilt, but as evidence to rebut Jalowiec's effort to establish residual doubt as a mitigating factor.  By that time, the jury had already heard substantial evidence that Jalowiec was involved in the murder, such as the detailed account of Michael Smith, evidence of Lally's blood in the trunk of Joann Fike's LeBaron, and an abundance of testimonial and circumstantial evidence that placed Jalowiec and Lally together in the LeBaron on the night that Lally was killed.  Viewing the record as a whole, there is no reasonable probability that the sentencing verdict would have been different had counsel objected to this hearsay evidence and managed to have it excluded.

The Ohio Supreme Court's resolution of this claim, finding no *Strickland* prejudice, was not contrary to or an unreasonable application of clearly established federal law.

### D.      Ineffective Assistance of Counsel:   Mitigation Investigation and Presentation

In Claim 36, Jalowiec contends that trial counsel performed ineffectively at the penalty phase by failing to adequately investigate and present mitigation evidence.  He contends that his attorneys left undiscovered many types of humanizing details that would have significantly enhanced his mitigation case.   The district court deemed the claim procedurally defaulted based on the Ohio Court of Appeals' holding  that Jalowiec's third amended petition was successive. *See Jalowiec*, 2008 WL 312655, at *41.  Again, for the reasons set forth above, the Ohio Court of Appeals' enforcement of this procedural bar was erroneous.  It therefore represents no bar to habeas review of the merits of Jalowiec's claim.  *See Cone*, 129 S.Ct. at 1780-81.  In evaluating the merits of

the claim, the district court correctly summarized the governing standards and determined that counsel's investigation may have been deficient, but concluded that Jalowiec had not shown *Strickland* prejudice. *Jalowiec*, 2008 WL 312655, at \*91-94. The district court correctly compared the mitigation case that was presented with the evidence that could have been presented if a more thorough investigation had been conducted. The court concluded that the evidence adduced in post-conviction proceedings was of marginal value, either because it was cumulative or because it was not strongly mitigating.

Counsel's failure to reasonably investigate a defendant's background and present mitigating evidence at sentencing can constitute ineffective assistance. *Wiggins v. Smith*, 539 U.S. 510, 522-23 (2003); *Williams*, 529 U.S. at 395-96. In assessing the reasonableness of an attorney's mitigation investigation, the court considers "not only the quantum of evidence already known to counsel," but also whether that evidence should have led "a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527. Counsel cannot make a fully informed decision with respect to sentencing strategy where the investigation into mitigating factors is abandoned at an unreasonable juncture. *Id.* at 527-28. Nor is counsel permitted to rely solely on information provided by the defendant and his family in determining the extent of a proper mitigation investigation. *Rompilla v. Beard*, 545 U.S. 374, 388-89 (2005). Nonetheless, "reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Id.* at 383.

In determining whether the performance was constitutionally deficient, we ask whether the mitigation investigation was reasonably complete and whether the mitigation information the attorneys did discover should have prompted them to inquire further. *See Haliym v. Mitchell*, 492 F.3d 680, 712 (6th Cir. 2007). To demonstrate *Strickland* prejudice, Jalowiec is required to show that the additional evidence turned up in post-conviction proceedings differs "in a substantial way—in strength and subject matter—from the evidence actually presented at sentencing." *Fautenberry v. Mitchell*, 515 F.3d 614, 626 (6th Cir. 2008) (quoting *Clark v. Mitchell*, 425 F.3d 270, 286 (6th Cir.

2005)).   However, failing to introduce additional mitigation evidence that is only cumulative of that already presented does not amount to ineffective assistance.  *Nields v. Bradshaw*, 482 F.3d 442, 454 (6th Cir. 2007).

Here, in his unsworn statement, Jalowiec testified that he had dyslexia and failed first grade, but said little more about school other than that he had perfect school attendance from kindergarten through fifth grade.  He testified that he was diagnosed with rheumatoid arthritis at a young age, which made it difficult for him to do school work and caused him to drop out of high school.  Jalowiec's grandfather, Edward Jalowiec, Sr., testified that Jalowiec used to help him with work around the house and the golf course run by the family until Jalowiec's arthritis limited him. Jalowiec's sister, Tammy,  testified briefly about hardships caused by Jalowiec's arthritis.  She explained that Jalowiec was the victim in a bar fight, not the aggressor.  She did not think he was capable of murder.   Jalowiec's father, Edward Jalowiec, Jr., testified that he and Jalowiec's mother, Sarah, divorced when Jalowiec was a teenager.  Jalowiec's father moved out of state.  He was not aware that Jalowiec was involved in fighting or drugs. Sarah Jalowiec testified that Jalowiec "always had been a fun loving kid" and that he loved animals.  She testified that his arthritis became a significant problem when he was in fifth or sixth grade, affecting his school attendance and his attitude.  She said he continued to suffer from the condition.  She was unaware that he used drugs.  Aside from these matters, the defense offered no mitigation evidence regarding Jalowiec's family background and history.

We concur in the district court's assessment that this mitigation case is not suggestive of a thorough and competent mitigation investigation.  Defense counsel did obtain a psychological evaluation of Jalowiec, but apparently decided against using the results.  In a two-page report issued approximately one week before the penalty phase, but not introduced at trial, psychologist Deborah Koricke, Ph.D., discussed her impressions after a three-hour examination of Jalowiec.  She noted his history of dyslexia, hyperactivity, and arthritis, and that he had been "hospitalized psychiatrically at age 16 for suicidal ideation."   Dr. Koricke also noted that Jalowiec reported no

mistreatment during childhood and that his IQ score of 98 was within the average range. Jalowiec's Minnesota Multiphasic Personality Inventory results, "within admissible validity limits," were deemed to evidence limited insight into his effect on others, naïve defensiveness, overuse of repression, narrow lifestyle, mediocre ability to operate under stress, and paranoid features. Yet, in her summary, Dr. Koricke identified only three mitigating circumstances that should be considered in sentencing: (a) signs of a "psychiatric disorder," based on Jalowiec's "delusional belief" that a monkey is his best friend; (b) a history free of seriously violent acts and demonstrated ability to form positive long-term relationships with others; and (c) Jalowiec's relatively young age. Thus, Dr. Koricke's assessment offered little compelling support for mitigation.

In post-conviction proceedings, Jalowiec presented additional evidence regarding his family background and history, but it is not significantly different in kind or strength from what was presented in trial. Jalowiec also submitted an affidavit from psychologist James Eisenberg, Ph.D., critical of the superficiality of Dr. Koricke's evaluation, and critical of defense counsel's reliance on it in formulating their mitigation strategy. However, Dr. Eisenberg apparently did not examine Jalowiec at all and offered no further substantive evidence, mitigating or otherwise.

In sum, Jalowiec has made no persuasive argument on appeal that the district court erred in holding that he failed to show *Strickland* prejudice. The mitigation evidence that Jalowiec gathered subsequent to his 1996 trial is not compelling. Jalowiec has not identified evidence so substantially different in strength or subject matter from what was presented at trial to support the conclusion that a more complete mitigation investigation and presentation would have given rise to a reasonable probability of a different outcome sufficient to undermine confidence in the jury's verdict. *Cf. Porter v. McCollum*, 130 S.Ct. 447, 455-56 (2009). We therefore affirm the district court's denial of this claim.

### E.  Ineffective Assistance of Appellate Counsel

In his final claim, Claim 42(a) and (c), Jalowiec contends that appellate counsel performed ineffectively by failing to raise appellate challenges to Jalowiec's trial counsel's conflict of interest and to the admission of allegedly unconstitutional hearsay evidence.  Because Jalowiec has failed to show prejudice resulting from his trial counsel's previous representation of Terry Hopkins, *see supra*, Part III.B, he cannot demonstrate prejudice in connection with his appellate counsel's failure to raise this claim and we need not further address Claim 42(a).   He acknowledges that counsel did raise an appellate hearsay claim, but he complains that counsel's claim addressed the testimony of only four trial witnesses while overlooking more egregious hearsay testimony by other witnesses.   Most of the hearsay testimony identified by Jalowiec concerns statements attributed to Danny and Raymond Smith, especially Danny Smith's statements showing his intent to harm or kill Lally.  His primary objection to this testimony is that the prosecution purportedly offered it under Ohio R. Evid. 801(D)(2)(e)'s exception for a co-conspirator's statements without showing the existence of a conspiracy and defendant's participation therein.  He notes that counsel repeatedly objected on this basis, but Jalowiec argues that none of the testimony at issue actually connected *him* to Danny Smith's conspiracy to kill Lally.

The parties do not dispute that this ineffective-assistance claim was fully exhausted in the state courts and properly preserved for habeas review and that our review is governed by AEDPA.  The Ohio Supreme Court summarily rejected the claim, holding Jalowiec had failed to raise a genuine issue as to whether he was deprived of effective assistance of counsel on appeal. *State v. Jalowiec*, 751 N.E.2d 467, 468 (Ohio 2001).  In rejecting the claim, the court noted that many of Jalowiec's hearsay objections were rejected on direct appeal. *Id.* (citing *Jalowiec*, 744 N.E.2d 163).  In its earlier ruling, the court reasoned that independent evidence established that a conspiracy to kill Lally existed on the night of his murder based on the testimony of Michael Smith, Sharon Hopkins and Brian Howington, and that Jalowiec had earlier been associated with threatening Lally. *Jalowiec*, 744 N.E.2d at 172-73.  Accordingly, the court

concluded that the prosecution had adequately established the existence of a conspiracy, justifying the introduction of hearsay statements under Rule 801(D)(2)(e). *Id.* The district court denied habeas relief, finding that the Ohio courts' disposition of the claim was not contrary to or an unreasonable application of clearly established federal law. *Jalowiec*, 2008 WL 312655, at \*110-13.

Failure of appellate counsel to raise an issue on appeal can amount to constitutionally ineffective assistance. *McFarland*, 356 F.3d at 710. Yet, counsel has no obligation to raise every possible claim and "the decision of which among the possible claims to pursue is ordinarily entrusted to counsel's professional judgment." *Id.* An appellate attorney is not required to raise a non-meritorious claim. *See Wilson v. Mitchell*, 498 F.3d 491, 514-15 (6th Cir. 2007). In addition, of course, to warrant habeas relief, a petitioner must demonstrate that any deficiency in appellate counsel's performance resulted in *Strickland* prejudice. *Evans v. Hudson*, 575 F.3d 560, 564-65 (6th Cir. 2009).

Considering the bases on which the Ohio courts rejected Jalowiec's challenge to the admissibility of co-conspirator hearsay on direct appeal, it is practically inconceivable that he would have prevailed if appellate counsel had raised the argument more completely and less "ineptly." The same independent evidence of a conspiracy that justified admission of other hearsay statements also justified admission of statements that appellate counsel did not specifically challenge. Jalowiec continues to quarrel with the adequacy of the independent evidence that was deemed to show his involvement in the conspiracy. Yet, the Ohio Supreme Court concluded that the trial testimony was more than sufficient to establish that a group of men conspired to kill Lally and that Jalowiec participated in that conspiracy. *See Jalowiec*, 744 N.E.2d at 172-73. The court further noted that once such a conspiracy was established, Rule 801(D)(2) permitted the admission of "'a statement by a coconspirator of a party during the course and in furtherance of the conspiracy upon independent proof of the conspiracy.'" *Id.* at 172.

The Ohio courts' resolution of this evidentiary question has not been shown to be erroneous, such that Jalowiec's right to a fair trial was compromised. Nor has

Jalowiec shown that the Ohio Supreme Court's rejection of his ineffective-assistance-of-appellate-counsel claim was an objectively unreasonable application of *Strickland*. Jalowiec has not shown there is a reasonable probability that the outcome of his appeal would have been different but for appellate counsel's deficiency in challenging the hearsay statements. We affirm the denial of habeas relief on this claim as well.

## IV. CONCLUSION

For the foregoing reasons, the judgment of the district court denying petitioner Jalowiec's petition for writ of habeas corpus is **AFFIRMED.**