RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 12a0414p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

ARTHUR BELL,

                *Petitioner-Appellee,*

    *v.*

CAROL HOWES, Warden,

                *Respondent-Appellant.*

No. 11-1046

> Appeal from the United States District Court
> for the Eastern District of Michigan at Detroit.
> No. 2:06-cv-15086—Arthur J. Tarnow, District Judge.

Argued: July 19, 2012

Decided and Filed:  December 19, 2012

Before:  SILER and MOORE, Circuit Judges; VAN TATENHOVE, District Judge.[*]

_____

## COUNSEL

**ARGUED:** John S. Pallas, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellant.  Joan Ellerbusch Morgan, Sylvan Lake, Michigan, for Appellee.  **ON BRIEF:** John S. Pallas, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellant.  Joan Ellerbusch Morgan, Sylvan Lake, Michigan, for Appellee.

_____

## OPINION

_____

VAN TATENHOVE, District Judge.  Over two decades ago Arthur Bell was convicted of felony murder and possession of a firearm while committing a felony in the shooting death of William Thompson.  Bell petitioned for a writ of habeas corpus with

_____

[*]The Honorable Gregory F. Van Tatenhove, United States District Judge for the Eastern District of Kentucky, sitting by designation.

the District Court for the Eastern District of Michigan. The petition was granted. For the reasons stated below, the district court's decision will be REVERSED and the case will be REMANDED.

## I.

On September 22, 1988, Priscilla Matthews and William Thompson (Herk[1]) were in a motel room in Detroit, Michigan. That evening, Matthews called her sister who reported that three men were looking for Thompson and Matthews. Matthews testified that the three men were Bobby Mims (Oddie[2]), Mark Sylvertooth, and Chill.[3] Testimony revealed that Thompson sold drugs on Mims' behalf, and a dispute about a missing quantity of drugs had arisen.

Sometime after 10:00 p.m., the motel room door was kicked open. What transpired next is disputed. Matthews testified that Sylvertooth and Chill carried Thompson out of the room, put him in a car, and drove away. Mims, Sylvertooth, Chill, and Thompson were the only individuals in the car. After a short time, the car returned and Mims asked Matthews about the missing drugs. While that was going on, Chill quickly entered and left the motel room.

Sylvertooth's recounting of this situation has a different cast and beginning, and was relied upon by the trial court. He testified that Matthews called Mims and disclosed that Thompson was with her at the 20 Grand Motel. In response, Sylvertooth, Mims, Durone Jenkins,[4] and Bell drove to the motel. Sylvertooth and Bell forced themselves

---

[1]Nicknames are used throughout this case's briefs and opinions and will be noted parenthetically after the first mention of the named individual. After that, only the individual's proper name will be used.

[2]In addition to Oddie, Mims is also called "Oddie Doddie" and "Oddity Doddity."

[3]Matthews did not know Chill or Chilly Will by any other name.

[4]Several names have been used when referring to Jenkins. Appellant cites testimony that Jenkins was commonly called "Otto" and states that Jenkins' first name is Jerome. Appellee states that Jenkins' name is Durone Jenkins, but contends that his proper name is Otto Hilliard. Appellee refers to this individual as Hilliard throughout his brief. The district court opinion utilizes Durone Jenkins, or Jenkins, and this opinion will follow the district court's lead. Various parts of the record refer to Jenkins by all of those names.

into Thompson and Matthews's room. While Matthews fled into the room's bathroom, Thompson was abducted by Sylvertooth and Bell.

Thompson was driven away by Bell, Sylvertooth, Jenkins, and Mims. The car made an undetermined number of stops while Mims severely battered Thompson. Mims exited the vehicle after a period of time, and Jenkins, Sylvertooth, Bell, and Thompson traveled to a nearby viaduct where Bell shot Thompson as he sat in the car. Police responded to the gunshots, but the suspects fled, leaving the victim dead in the automobile.

Within hours, the police arrested Mims. Matthews's accurate recitation of the car's license plate linked Mims to the car in which Thompson was killed. Sylvertooth presented himself to police on September 30 and gave a statement to police implicating Bell that same day.

On October 3, 1988, Bell was arrested. The following day he participated in a lineup and gave a statement. Matthews viewed that lineup but was unable to make a positive identification. Bell's statement revealed that he received transportation to and from a meeting with his parole officer from Mims, Sylvertooth, and Jenkins; then he was dropped off. Bell explained that Mims and Sylvertooth contacted him about Thompson's murder and problems associated with it. Bell was then released from police custody.

On October 20, Mims, Sylvertooth, and the unidentified Chilly Will were charged with Thompson's murder. The identification of Chilly Will unfolded on January 23, 1989 when police arrested Willie King[5] on the suspicion that he was Chilly Will.

Willie King lived near the location at which Thompson was last seen. This was close to the place from where Matthews claimed she knew Chilly Will. Whether King's

_____

[5] Willie King is also known as Willie Stubblefield. The district court opinion misstates that King was described as possessing a .38 caliber weapon, which is the same type of weapon as that used in Thompson's murder. Rather, the witness stated that Gary Holcomb possessed that weapon. This information was obtained through a police investigation into whether Holcomb, who went by "Chill Will" and drove a car emblazoned with "Chil Will" or "Chilly Willie," was the Chilly Will who killed Thompson.

physical characteristics match Matthews's description is subject to debate—she described him as a black male with a "real dark" complexion, 22 years old, 5'10", and weighing 160 pounds, while police records list him as a black male, 24 years old, 5'7", and weighing 150 pounds—but it is clear that King went by the nickname Chilly Will. King also knew Thompson and Mims, but he was unfamiliar with Sylvertooth. King never faced trial over this incident, and in 2002, he died.

In January 1989, Durone Jenkins was interviewed by police. Jenkins was never prosecuted, but he inculpated himself as the driver of the car in which Thompson was killed, and he corroborated Sylvertooth's factual recounting, albeit with less clarity. That is, Jenkins only described the fourth party through use of the nickname "Tone." Grasping on to that fact, Bell argues that Jenkins did not refer to him. Bell's trial counsel, however, explained that there was no question that Jenkins was referring to Bell. Bell's counsel pointed to Sylvertooth's reference to Tone for support that this issue was never seriously questioned: "[e]verybody else clarified that Tone is Bell."

Nearly six months after Bell was arrested and released, Bell was arrested again. He proceeded to a bench trial and on June 19, 1989 was found guilty of felony murder and possessing a firearm while committing a felony. He was sentenced to life imprisonment without parole for the murder, which was to be served consecutively to a two-year sentence for possession of a firearm. Bell appealed his conviction to the Michigan Court of Appeals. He argued, in part, that his counsel provided ineffective assistance in failing to interview two alibi witnesses and present them at trial. The court of appeals remanded the case for an evidentiary hearing, and the trial court found that counsel had performed adequately. This decision was appealed and affirmed on the merits by the Michigan Court of Appeals on September 2, 1992. Review of this decision was denied by the Michigan Supreme Court.

Thirteen years passed before Bell petitioned on October 31, 2006 for a writ of habeas corpus.[6] Counsel was appointed to aid Bell in his petition, and in the midst of

---

[6]Bell filed his petition for habeas after April 24, 1996, thus AEDPA provides the proper framework for examining this case. *See Harris v. Haeberlin*, 526 F.3d 903, 909 (6th Cir. 2008).

investigating Bell's claims, found what was believed to be material, relevant evidence that the prosecution had not disclosed, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). The district court granted a stay of the habeas proceeding so that Bell could exhaust his *Brady* claim in state court. The trial court denied Bell's motion on the merits. Both the Michigan Court of Appeals and Michigan Supreme Court denied Bell's applications for leave to appeal. Bell's federal petition was re-opened and an evidentiary hearing was conducted to examine his *Brady* claim.

Although Bell petitioned for habeas relief on at least five grounds, the district court granted Bell's petition only with regard to his *Brady* and ineffective assistance of counsel claims. *Bell v. Howes*, 757 F. Supp. 2d 720 (E.D. Mich. 2010). The remaining claims were not addressed by the district court because it determined that habeas relief was merited on both of those grounds.

## II.

De novo review is applied to a district court's legal conclusions and mixed questions of fact and law in a habeas corpus proceeding. *Jalowiec v. Bradshaw*, 657 F.3d 293, 301 (6th Cir. 2011). Review of habeas petitions is also conducted pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214, and is "highly deferential" to a state court's ruling. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011). AEDPA, as codified in pertinent part at 28 U.S.C. § 2254(d), prohibits a federal court from granting a habeas petition for any claim that was adjudicated on the merits in state court unless that decision

> (1)     resulted in a decision that was contrary to, or involved the unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The district court's decision to grant Bell's petition was based on a determination that the Michigan state courts unreasonably applied federal law:  in this case, the Supreme Court's decisions in *Brady*, 373 U.S. 83, and *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

Examining whether federal law was unreasonably applied requires a reviewing court to ascertain whether the state court's application was "objectively unreasonable." *Williams v. Taylor*, 529 U.S. 362, 409 (2000).  Importantly, "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id.* at 410.  Perhaps encapsulating this idea most cogently, habeas relief is unavailable "so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  A final part of the equation in determining unreasonable application is that the rule's specificity must be considered.  That is, "[t]he more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Id.* (quoting *Yarborough*, 541 U.S. at 664).

With regard to reviewing factual findings, state court findings are also owed deference under AEDPA, with 28 U.S.C. § 2254(e)(1) requiring that "a determination of a factual issue made by a State court shall be presumed to be correct."  That presumption can be overcome only by a showing of clear and convincing evidence. 28 U.S.C. § 2254(e)(1).  A district court's factual findings, meanwhile, will not be overturned unless they are clearly erroneous. *Brooks v. Tennessee*, 626 F.3d 878, 888 (6th Cir. 2010) (quoting *Ivory v. Jackson*, 509 F.3d 284, 291 (6th Cir. 2007)).  A clearly erroneous finding is one that, "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.* (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985)).

## III.

## A.

Bell contends that his rights under *Brady*, 373 U.S. 83, were violated. He claims the prosecution failed to disclose two items of evidence pertaining to Willie King: the record of King's arrest on January 23, 1989 on the suspicion that he was Chilly Will and King's statement to police subsequent to his arrest ("King documents").

This Court summarized the elements of a *Brady* violation:

> *Brady* requires the prosecution to disclose exculpatory and impeachment evidence that is material either to guilt or to punishment. The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A *Brady* violation has three elements: (1) the evidence must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) the evidence must have been suppressed by the state, either willfully or inadvertently; and (3) prejudice must have ensued.

*Jalowiec*, 657 F.3d at 302-03 (quoting *Beuke v. Houk*, 537 F.3d 618, 633 (6th Cir. 2008) (internal quotation marks and citations omitted)). The district court found that a *Brady* violation occurred, overruling the state court's decision. Because inadequate deference was given to the state court's decision, the district court must be reversed.

The district court's decision that *Brady* was violated is most easily analyzed by looking first at whether the police reports related to King were withheld. Bell bears the burden of showing the prosecution suppressed evidence. *United States v. Warshak*, 631 F.3d 266, 300 (6th Cir. 2010). A complicating factor that undergirds the entire suppression inquiry is the significant amount of time that passed between Bell's conviction and this review. During that period, Bell's trial counsel, King, and Mims died; Matthews, Sylvertooth, and Jenkins refused to discuss this matter; and the prosecutor, whose file on this case is missing, the two detectives involved, and Bell's attorneys who represented him on his direct appeal do not recall the details about discovery in this case.

The Wayne County Circuit Court found on post-judgment review that Bell failed to establish that the reports were suppressed. Its decision identified two factors supporting Bell's claim, both contained in an affidavit sworn to by Bell. The first factor was that Bell was unaware of reports about King. The second factor was that Bell did not remember his attorney's mentioning King. On that evidence, the state court ruled that Bell's argument failed to establish suppression, holding "it is just as possible that trial counsel received the reports yet did not mention these to defendant." Michigan's Court of Appeals and Supreme Court declined to review this decision.

Collateral review resulted in a different conclusion. The district court accused the state court of neglecting to consider important information. When the ignored evidence was considered, the district court found the state court's decision unreasonable. The district court rested its decision on six pieces of evidence. *Bell*, 757 F. Supp. 2d at 732-733.

First, "the failure of trial counsel to introduce the [King documents] into evidence." *Id*. at 732. Second, Bell's counsel's decision not to "cross-examine any witnesses about the arrest of an individual whose appearance was consistent with Matthews' description of 'Chilly Will.'" *Id*. Third, "[t]he trial court also did not consider appellate counsel [Daniel] Rust's letter incorrectly noting that a lineup was not conducted in Bell's case"—a statement indicating that Rust was not given a complete file.[7] *Id*. at 732-33. Fourth, "a small subset of documents were separated from the remainder of the police file." *Id*. at 733. Fifth, the police were unable to find Bell's homicide file in 1994 after he submitted a Freedom of Information Act request. The file was found after the district court issued an order, but "the degree of diligence and care befitting maintenance of a murder investigation file was not satisfied in this case." *Id*. Sixth, "the prosecutor's file, which may have provided some insight into what was produced, was destroyed by the prosecutor's office." *Id*.

---

[7]Appellee and the district court both mentioned Rust's letter but neither cited to the location of the letter in the record. Independent review did not indicate that Rust's letter was in the record. Even accepting the information in Rust's letter as true, the finding on this claim is not impacted.

The disagreement between the state court and district court is essentially focused on the meaning of the absence of information. Does the fact that Bell's counsel refrained from mentioning Chilly Will indicate he did not know about Chilly Will, as the district court contends? Or, did Bell's counsel neglect to mention Chilly Will because he determined information about Chilly Will was not beneficial to Bell's case, as the state court implicitly concludes?

The conclusion reached by the district court stands in defiance of the Supreme Court's explication about reviewing habeas petitions. State court decisions are to "be given the benefit of the doubt" and the standard for evaluating decisions is "highly deferential." *Cullen*, 131 S. Ct. at 1398 (citing *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002)). There must be "no reasonable basis for the state court to deny relief" before a petition is granted. *Harrington*, 131 S. Ct. at 784. And "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 786 (citation omitted). Because the state court finding on this element of *Brady* is reasonable—it is a conclusion on which reasonable jurists could disagree—Bell has failed to carry his burden. Consequently, Bell's *Brady* challenge fails.

**B.**

We have recognized that a credible claim of actual innocence may equitably toll AEDPA's statute of limitations. *Souter v. Jones*, 395 F.3d 577 (6th Cir. 2005); *accord Perkins v. McQuiggin*, 670 F.3d 665 (6th Cir. 2012), *cert. granted*, 81 U.S.L.W. 3074 (U.S. Oct. 29, 2012) (No. 12-126). "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998). "[A] credible claim of actual innocence is extremely rare," *Souter*, 395 F.3d at 600, and so "[t]he actual innocence exception should 'remain rare' and 'only be applied in the extraordinary case.'" *Id.* at 590 (quoting *Schlup v. Delo*, 513 U.S. 298, 321 (1995)). Morever, "[t]his 'gateway actual innocence claim' does not require the granting of the writ, but instead permits the petitioner to present his original habeas petition as if he had not filed it late." *Perkins*, 670 F.3d at 670.

As to the requirements of the actual-innocence exception, "where an otherwise time-barred habeas petitioner can demonstrate that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying constitutional claims." *Souter*, 395 F.3d at 602. That is, "actual innocence 'does not merely require a showing that a reasonable doubt exists in the light of the new evidence, but rather that no reasonable juror would have found the defendant guilty.'" *Cleveland v. Bradshaw*, 693 F.3d 626, 633 (6th Cir. 2012) (quoting *Schlup*, 513 U.S. at 329). To raise the claim, a petitioner must present "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324. After such evidence is presented, "the habeas court must consider 'all the evidence,' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial.'" *House v. Bell*, 547 U.S. 518, 538 (2006) (quoting *Schlup*, 513 U.S. at 327–28); *accord Bousley*, 523 U.S. at 624.

Bell contends, and the government does not dispute, that the King documents constitute new reliable evidence not presented at trial. The district court thus held that "new evidence of the existence of an actual person known as 'Chilly Will'" living nearby where Matthews claims to have met Chill—when taken "together with the evidence presented at trial[] and the evidence of alibi witnesses not presented at trial"—was sufficient for it to find "that it is more likely than not that no reasonable juror would have found Bell guilty beyond a reasonable doubt." *Bell v. Howes*, 757 F. Supp. 2d 720, 731 (E.D. Mich. 2010). We disagree. The King documents can be read to establish that at least one individual named Chill Will existed in the vicinity.[8] However, this fact does not tie that individual to the underlying crimes, nor does it upset the central

---

[8]The district court also found that "[King's] vehicle had the words 'Chilly Willie' painted on the side" and that a witness "told police that he had seen King with a .38 caliber short barrel weapon," similar to the murder weapon. *Bell*, 720 F.3d at 731. As Bell himself points out, the district court was mistaken. The documents here referred not to King, but to a third man named Gary Holcomb. We have no evidence that Matthews knew Holcomb.

dispute at trial: whether Matthews—who claimed that Chill, not Bell, was one of the kidnappers—was more credible than the State's witness Sylvertooth, who claimed the opposite. The district court discounted Sylvertooth's testimony because Sylvertooth had secured a plea agreement for his testimony. *Id.* But Bell's attorney presented information about the plea agreement at trial. Moreover, the district court overlooked the fact, not considered at trial, that Sylvertooth was "a volunteer . . . at the time he gave his initial testimony" to the police, meaning that when he first identified Chill, he "was not testifying under any kind of grant or immunity or . . . sentence bargain." [R. 24-4 at 157 (transcript of proceedings before the trial court following remand from Michigan Court of Appeals).] The district court also neglected statements by a third witness, Jenkins, that would have corroborated Sylvertooth's testimony but that were not introduced at trial.

The district court was also convinced by the potential influence of two uncalled alibi witnesses. We note that the state trial court found in a later proceeding that one of these witnesses would have testified "very much incredibly" in offering an alibi for Bell. [*Id.* at 158.] Moreover, while failure to call alibi witnesses suggests legal insufficiency, we cannot say that this testimony alone would have satisfied the high bar for demonstrating factual innocence. In considering, as we must, all the evidence relating to Bell's innocence, it appears that there is at least as strong a case against Bell now as was presented at trial. We thus cannot conclude that Bell has proven that his is the extremely rare case for which it more likely than not that no reasonable juror would have found him guilty. Accordingly, equitable tolling is not appropriate, and Bell's ineffective-assistance-of-counsel claim remains precluded by AEDPA's statute of limitations.

## IV.

For the reasons stated above, we **VACATE** the district court's judgment granting Bell's petition for writ of habeas corpus and **REMAND** for further proceedings consistent with this opinion.