**NOT RECOMMENDED FOR PUBLICATION**
File Name: 18a0037n.06

Nos. 16-2429/2474

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| MARK DAVID BAILEY, | ) | **FILED**<br>Jan 19, 2018<br>DEBORAH S. HUNT, Clerk |
| | ) | |
| Plaintiff-Appellee/Cross-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| BLAINE LAFLER, Warden, | ) | DISTRICT OF MICHIGAN |
| | ) | |
| Respondent-Appellant/Cross-Appellee. | ) | OPINION |
| | ) | |
| | ) | |

**BEFORE:** ROGERS, COOK, and STRANCH, Circuit Judges.

**JANE B. STRANCH, Circuit Judge.** Mark Bailey brought a habeas corpus petition seeking to overturn his 2005 conviction for the 1989 murder of Mary Pine, arguing primarily that the State of Michigan withheld evidence that prevented him from presenting a complete defense. The district court granted the petition on that claim, while dismissing two other habeas claims regarding ineffective assistance of counsel and admission of evidence of other bad acts. Bailey and the State each appeal the dismissal and grant of these habeas claims, respectively. We agree with the district court that the State violated *Brady v. Maryland* when it withheld evidence that could have altered the Michigan courts' and jury's views of the case. But as a federal court considering a state prisoner's habeas petition, our decision is constrained by the review standard of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Under that standard,

we are compelled to REVERSE the district court's partial grant of Bailey's habeas petition. We also AFFIRM the district court's partial denial of Bailey's habeas petition.

## I. BACKGROUND

On the evening of February 15, 1989, police found seventy-nine-year-old Mary Pine dead in the bathroom of her home in Big Rapids, Michigan. Pine had been stabbed and beaten over the head, and she was found with an electrical cord wrapped around her neck. Bailey, then a nineteen-year-old resident of Big Rapids, sometimes did yard work for Pine. In an interview the day after the murder, Bailey told the police that he had shoveled snow from Pine's driveway on the day of the murder.

On the night of the murder and in the days afterward, multiple detectives tried to follow snow tracks leading away from Pine's house and to identify shoes that matched those tracks. Detective Richard Miller followed the snow tracks from Pine's house for nearly a mile and became familiar with the tread pattern and gait displayed by these tracks. Detective George Pratt also observed the snow tracks outside Pine's home on the evening of February 15. The next morning, he went to Bailey's home and saw a partial footprint in the ice that he believed contained the same pattern as a print he saw in Pine's yard. He also saw similar prints near a gravel pit where Pine's car, which was missing from her garage after the murder, had been found.

Both Detectives Miller and Pratt attempted to identify shoes with the tread pattern they had observed in the snow tracks. Pratt interviewed Bailey twice after the murder and recovered a pair of shoes Bailey initially said he had worn on the day of the murder, though Bailey later claimed to have worn a different pair of shoes that day.

During the investigation, police noticed similarities between the Pine murder and the 1980 murder of 89-year-old Stella Lintemuth[1] in Big Rapids, at which time Bailey would have been ten years old. Police sought to determine if the same killer was responsible. In March 1989, the Mecosta County prosecutor sent Bailey's fingerprints to the Department of State Police to determine if they matched fingerprints discovered at the scene of the Lintemuth murder. The resulting laboratory report concluded that Bailey's fingerprints did not match those from the Lintemuth murder. In April 1989, at the State's request, the Department of State Police prepared a profile of the potential killer of both Lintemuth and Pine, noting that there were "several similarities" between the two murders. In May 1990, also at the State's request, the FBI Academy at Quantico issued a profile report further detailing the similarities between the two crimes and concluding that "one offender is most likely responsible for both crimes."

The FBI report included several paragraphs describing similarities between the 1980 and 1989 murders. Both victims were elderly white females who lived alone in single-family homes in the same area of Big Rapids, Michigan. Both victims had left their doors unlocked, neither had any known enemies, and both had the same causes of death: stab wounds and blunt trauma in excess of what was required to cause death. In both cases, an electrical cord was wrapped around the neck or face of the victim, but served no apparent purpose in the cause of death. Both murders probably occurred in the daytime by right-handed offenders who entered the homes without breaking in and committed the murders using objects found in the home, which they then left near the bodies. The FBI Report concluded that neither murder showed evidence of theft or sexual assault, but the State has disputed that conclusion on appeal. Specifically, the Stated noted that unlike in the Lintemuth murder, Pine's car and some jewelry were missing, and her

---

[1] Some parts of the record spell the 1980 victim's name as Lintenmuth. This opinion will follow the convention of the district court and magistrate judge in spelling the 1980 victim's name as Lintemuth.

pants and underwear had been pulled down and she was stabbed in the vaginal and buttocks areas.

After receiving the fingerprint report, the state police report, and the FBI report, the State chose not to prosecute Bailey. The Pine murder investigation went cold for nearly fifteen years.

In 2003, while incarcerated on unrelated charges, Bailey was a cellmate of Robert Gene Thompson for about six months. Thompson testified that, while they were cellmates, Bailey confessed to having murdered Pine. According to Thompson, Bailey described his actions on the day of the murder extensively, matching various details from the police investigation in 1989. After learning of Thompson's claim that Bailey had confessed in detail, the State reinitiated its investigation of Bailey and, in 2005, Bailey went to trial for the Pine murder. Thompson, who was serving a life sentence for first-degree felony murder, testified at Bailey's trial in exchange for the State's agreement to aid Thompson in his efforts to obtain a new trial for himself.

The defense sought to present evidence from the 1980 Lintemuth murder to argue that the similarity of the crimes suggests that one killer was likely responsible for both, as the FBI had concluded, and that because Bailey was ten years old at the time of the 1980 murder, he was probably not responsible for either murder. The defense was not aware that the State possessed the lab report finding that Bailey's fingerprints did not match those recovered from the 1980 murder (and neither was the court). During pre-trial hearings, the trial court granted the prosecution's motion to exclude all evidence related to the 1980 murder, ruling (without providing any reasoning on the record) that evidence "regarding another murder of an elderly person when the defendant would have been about 10 years old . . . is not to be brought before the jury." *People v. Bailey*, No. 265803, 2007 WL 2141362, at *7 (Mich. Ct. App. July 26, 2007) (quoting the trial court).

Certain issues arising at trial are relevant on appeal. Detective Miller testified about his opinions concerning the snow tracks and the shoes that might have left them. Bailey's counsel objected that Miller could not provide such expert opinions. The trial court gave the prosecutor an opportunity to lay the foundation for Miller's opinions, and Miller testified that his testimony was based on familiarity with the tracks gained from following them for a mile, and the picture he had taken of one of the tracks, which he had with him at trial. The court instructed the jury that "those things" that Miller "just said" were "used to make his observations," and although Miller was not qualified as an expert, his testimony "would be an observation as opposed to an expert opinion." Miller testified that he had tracked footprints on many occasions during his thirty-four years as a police officer.

The prosecution also called an expert in footwear identification, Officer Gary Truszkowski, to testify. Truszkowski reviewed footwear impressions from the snow outside Pine's home and determined that they were consistent with Bailey's shoes. The prosecutor asked Truszkowski about a report prepared by defense expert Dr. Frederick, who reviewed photographs of Bailey's shoes and the snow tracks and noted that a lateral mark on one of Bailey's shoes was not evident in one of the photographs of tracks. Truszkowski testified that the mark was too fine to make much of an impression in the snow. Defense counsel objected, stating that he had agreed to admit Dr. Frederick's report without calling him to testify on the understanding that the prosecutor's expert (Truszkowski) would discuss only his own report, without criticizing that of Dr. Frederick. After discussion between counsel and the court, the attorneys agreed to offer both Dr. Frederick's report and the report of an FBI expert; both reports concluded that there was insufficient clarity or detail in the snow tracks to make a positive identification or elimination. Bailey agreed in court to this arrangement. On cross-examination, Truszkowski clarified that he

agreed with Dr. Frederick and the FBI that it was not possible to draw a positive identification from the tracks.

The trial court also admitted evidence of prior burglaries committed by Bailey over defense counsel's objection. Three Big Rapids residents testified that in 1986 they had hired Bailey to mow their lawns and he had entered their homes during the daytime and taken small amounts of cash. Each resident had confronted Bailey about the incidents and each time he admitted his actions. Each resident testified that Bailey had never acted antagonistic, belligerent, rude, or hostile to them, and in fact he had been polite and had backed away when confronted. A friend of Bailey's also testified that he had participated in several of the burglaries with Bailey, and that although he had spent a lot of time with Bailey in 1986, he had never seen any violent tendencies in him.

The prosecution told the court that it intended to offer this evidence to show Bailey's "pattern or scheme ('MO')" of being hired to do lawn jobs and then committing daytime burglaries, which it argued was consistent with the events leading to the Pine murder. The court instructed the jury that it could consider the burglaries only to the extent they showed a plan, system, characteristic scheme, or modus operandi or to the extent they showed who committed the Pine murder; the court instructed the jury not to consider this evidence for any other purpose, including whether Bailey was a bad person or was likely to commit crimes.

The jury convicted Bailey of first-degree premeditated murder and first-degree felony murder. Bailey was sentenced to life imprisonment without parole for one count of first-degree murder. The Michigan Court of Appeals rejected all of Bailey's arguments on direct appeal. Most importantly, the appeals court rejected Bailey's argument that the trial court's exclusion of evidence relating to the 1980 murder denied Bailey's right to present a complete defense in

violation of *Holmes v. South Carolina*, 547 U.S. 319 (2006). *People v. Bailey*, No. 265803, 2007 WL 2141362, at *7–*8 (Mich. Ct. App. July 26, 2007) (per curiam) (discussing *Holmes's* holding that evidence indicative of third-party guilt should be excluded "when it is too remote, when it lacks a connection with the charged crime, when it can have no other effect than to cast a bare suspicion upon another, or when it raises merely a conjectural inference that another person committed the crime"). On direct appeal, the State argued that the state police report linking the two murders arguably supported Bailey's identity as the killer in both cases, despite the fact that he was ten years old in 1980, and despite the fact that the State knew but did not disclose that Bailey's fingerprints did not match those recovered from the 1980 murder scene. The Michigan Supreme Court summarily denied Bailey's application for leave to appeal.

In 2007, two years after Bailey's conviction but one month before the state appellate court issued its opinion, the Mecosta County prosecutor initiated charges against Scott Graham for the 1980 Lintemuth murder. In 2009, after the Michigan Supreme Court had denied Bailey leave to appeal but before Bailey filed his habeas petition, Graham was convicted of the Lintemuth murder, largely based on the evidence that his fingerprints matched those found at the scene (presumably the same fingerprints that did not match Bailey's).

In 2009, Bailey filed a petition for habeas relief in federal court and the magistrate judge granted Bailey's motion for discovery seeking production of the criminal file in the Graham prosecution. From this discovery, Bailey's counsel learned for the first time in 2010 that fingerprints had been recovered from the 1980 murder scene, that police had tested Bailey's fingerprints against those, and that they did not match. The prosecution had not informed either Bailey or the state trial or appellate courts about these facts or the existence of the fingerprint lab report, although it was in the State's possession. The magistrate judge then granted Bailey's

-7-

motion to amend his habeas petition to add a claim concerning the fingerprint report under *Brady v. Maryland*, 373 U.S. 83 (1963), and stayed the case to allow Bailey to properly exhaust his *Brady* claim in the state court.

The state court, with Bailey's original trial judge presiding, denied Bailey's motion for relief from judgment, concluding that the fingerprint evidence had no impact on the Michigan Court of Appeals's conclusion that there was merely a speculative connection between the 1980 and 1989 murders. The Michigan Court of Appeals and Supreme Court each denied leave to appeal.

Back in federal court, the magistrate judge granted Bailey's motion to reopen the case, and issued a Report and Recommendation concluding that all of Bailey's habeas claims failed and no certificate of appealability should issue. Bailey filed objections. The district court disagreed and granted habeas relief for violations of *Brady* and *Holmes*. The district court denied Bailey's claims on ineffective assistance of counsel and the admission of the testimony on Bailey's burglaries, but issued a certificate of appealability on all four claims. The State timely appealed, and Bailey cross-appealed.

## II. ANALYSIS

In appeals of decisions on habeas corpus petitions, we review the district court's legal conclusions de novo and its factual findings for clear error. *Foster v. Wolfenbarger*, 687 F.3d 702, 706 (6th Cir. 2012). Federal courts reviewing habeas petitions regarding claims adjudicated on the merits by state courts are governed by the Antiterrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254(d).

Under AEDPA, a federal court may grant habeas relief if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schiro v. Landrigan*, 550 U.S. 465, 473 (2007). A state court's decision is not unreasonable "so long as fairminded jurists could disagree on [its] correctness." *Harrington*, 562 U.S. at 101 (internal quotation marks omitted).

### A.      *Brady* and *Holmes*

Bailey argues that the trial court's rejection of his *Brady* claim was an unreasonable application of *Brady v. Maryland* and its progeny. A *Brady* claim has three elements: (1) evidence favorable to the accused (2) was suppressed by the State, whether willfully or inadvertently, (3) and prejudice ensued. *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). Because the State does not dispute that the evidence here was favorable and suppressed, only prejudice is at issue in this case.

To establish prejudice the defendant must show that "there is a reasonable probability that the result of the trial would have been different if the suppressed documents had been disclosed to the defense." *Id.* at 289 (internal quotation marks omitted). A "reasonable probability" does not mean "more likely than not" in the *Brady* context, however. *Id.*; *see also id.* at 298 (Souter, J., concurring, joined by Kennedy, J.) (explaining that "the term 'probability' raises an unjustifiable risk of misleading courts into treating it as akin to the more demanding standard, 'more likely than not'"). Rather, *Brady* prejudice requires a showing that, without the suppressed evidence, the defendant did not receive "a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* at 290 (majority opinion). "[T]he question is whether the

-9-

favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* (citation and internal quotation marks omitted).

As both the trial court and the district court recognized, the *Brady* claim in this case involves an embedded *Holmes* claim. Bailey's *Brady* claim can succeed only if he shows prejudice, which requires showing that the suppressed fingerprint report would have undermined confidence in the jury's verdict. This necessarily entails a showing that the fingerprint report would have been entered into evidence and discussed before the jury. But because the trial court barred all discussion of the 1980 murder, the question at issue is whether knowledge of the fingerprint report would have altered the trial or appellate courts' rulings on the exclusion of the 1980 murder evidence. In other words, showing *Brady* prejudice requires showing a reasonable probability that the Michigan Court of Appeals would have ruled differently on Bailey's *Holmes* claim if it had known about the fingerprint report. If so—if there is a reasonable probability that disclosure of the suppressed fingerprint evidence would have led the state appellate court to vacate Bailey's conviction—then the suppressed evidence necessarily would have undermined confidence in the original verdict, satisfying *Brady*'s prejudice prong. If not, then the exclusion of the fingerprint evidence was irrelevant, and the *Brady* claim fails.

The state trial court correctly understood that Bailey's post-conviction *Brady* claim depended on whether the fingerprint report would have impacted the appeals court's *Holmes* ruling (on direct appeal). Because AEDPA applies to *Brady* claims, the question we must decide is whether fairminded jurists would disagree on the correctness of the state trial court's rejection of Bailey's post-conviction *Brady* claim. *See Bell v. Howes*, 703 F.3d 848, 854 (6th Cir. 2012) (applying AEDPA to a *Brady* claim). The trial court rejected Bailey's *Brady* claim by concluding that the fingerprint report would have had no impact on the appeals court's *Holmes*

analysis. The appeals court, without knowledge of the fingerprint report, had concluded that the connection between the 1980 and 1989 murders was so remote that exclusion of the evidence related to the 1980 murder purportedly showing third-party guilt did not violate *Holmes*. Therefore, to show that the trial court's *Brady* ruling was unreasonable under AEDPA, Bailey must show that fairminded jurists would not disagree that the fingerprint report would have altered the appeals court ruling on his *Holmes* claim on direct appeal.[2]

We start by examining both the appellate court's decision on the *Holmes* claim and the trial court's post-conviction decision on the *Brady* claim. Bailey argued on direct appeal that the trial court's exclusion of any discussion of the 1980 murder prevented him from presenting a complete defense, in violation of *Holmes*. The "Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Holmes*, 547 U.S. at 324 (internal quotation marks omitted). "This right is abridged by evidence rules that infringe upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve." *Id.* (internal quotation marks and brackets omitted). *Holmes* listed several examples of Supreme Court cases discussing evidentiary rulings that were arbitrary or disproportionate to their purposes. *Id.* at 325–26. By contrast, *Holmes* referred approvingly to the widespread acceptance of rules excluding evidence offered by criminal defendants to show third-party guilt "where it does not sufficiently connect the other person to the crime, as, for example, where the evidence is speculative or remote." *Id.* at 327 (quoting 40A Am. Jur. 2d, Homicide § 286, pp. 136–38 (1999)).

---

[2] The State argues that *Brady* described a trial right, and thus we should consider only the suppression's impact on Bailey's trial, not its impact on his appeal. Whatever the nature of *Brady* right generally, *Brady* prejudice depends on whether suppressed evidence would have undermined confidence in the jury's verdict. In this case, if the suppressed evidence's disclosure would have led the appeals court to vacate Bailey's conviction, then the suppressed evidence necessarily would have undermined confidence in his *trial* verdict, satisfying *Brady*'s prejudice prong.

The Michigan Court of Appeals rejected Bailey's *Holmes* argument on direct appeal, concluding that the trial court did not err in applying Michigan's rule that "evidence tending to incriminate another is admissible if it is competent and confined to substantive facts which create *more than a mere suspicion* that another was the perpetrator." *Bailey*, 2007 WL 2141362 at *8 (emphasis added) (quoting *People v. Kent*, 404 N.W.2d 668, 674 (Mich. Ct. App. 1987)). After reciting the *Holmes* standard, the appellate court determined that "[u]nder the circumstances presented, and considering the similarities between the crimes as well as the differences, a reasonable and principled decision would include one that finds nothing more than the creation of mere suspicion, a conjectural inference, excessive remoteness, or an inadequate connection." *Id.*

When Bailey learned of the suppressed fingerprint evidence and brought a post-conviction *Brady* claim, the trial court rejected it based on the following reasoning:

> The addition of evidence showing that Defendant's prints did not match those left at the Lintemuth crime scene does not in any way strengthen Defendant's claim regarding third party guilt. . . . The fact that Defendant's fingerprints did not match a particular set of prints left at the Lintemuth scene is not material to Defendant's guilt or innocence because this does not show that a third party committed the murder in this case. . . . This additional evidence does nothing to affect the [Michigan] Court of Appeals holding that the police [and FBI] profiles or perceived similarities between the Lintemuth and Pine murders was not enough to bring evidence of third party guilt before the jury. It was not and is not because it continues to be the case that the set of fingerprints added to the other evidence creates no more than a "mere suspicion, a conjectural inference, excessive remoteness, or an inadequate connection" to support a claim that a third party was responsible for the murder of Mary Pine.

Under AEDPA, the question before us now is whether all fairminded jurists would instead conclude that the fingerprint evidence would have changed the appeals court's *Holmes* holding. There is arguably a significant flaw in the trial court's analysis. The trial court reasoned that even if the fingerprint evidence suggested that Bailey did not commit the 1980 murder, it did not strengthen the *relationship* between the 1980 and 1989 murders, and therefore would not in any

way affect the Michigan Court of Appeals's *Holmes* ruling. As the district court reasoned, however, the trial court considered the fingerprint evidence in isolation, rather than in the context of the "whole case."

The fingerprint lab report was not the only evidence withheld—the State also did not disclose the very fact that it had requested that lab report. The State's investigatory choices surrounding and following the fingerprint report complete the story of the State's 1989–1990 investigation and demonstrate the *State's* belief, at least originally, in a link between the 1980 and 1989 murders. Police suspected Bailey immediately after the murder and investigated him thoroughly at that time. Investigators also recognized that there were similarities between the 1980 Lintemuth murder and the Pine murder. They asked for the FBI's opinion and the FBI concluded that the same person most likely committed both murders. To try to determine if Bailey was that single person, investigators had his fingerprints tested against those recovered from the 1980 murder scene. After learning that the fingerprints did not match, the State chose not to prosecute Bailey, and did not reinitiate its case for fifteen years. By withholding the fingerprint report, the State not only suppressed evidence that Bailey was not responsible for the 1980 murder, but also obscured the full arc of its investigation into the Pine murder. The State's request to test Bailey's fingerprints against those from the 1980 murder demonstrates the State's belief that the results of that test (i.e., the suppressed fingerprint report), and the 1980 murder in general, were "sufficiently connect[ed]" to the Pine murder, not "speculative or remote." *Holmes*, 547 U.S. at 327 (internal quotation marks omitted). Full knowledge of the investigatory timeline would have allowed the Michigan courts (and the jury) to see that it was the fingerprint report that likely convinced the State that Bailey was not responsible for the Pine murder— demonstrating that the State itself believed in 1990 that a third party was likely responsible for

killing Pine. The trial court considering Bailey's post-conviction *Brady* claim overlooked this consequence of the State's nondisclosure.

The Michigan trial court's original decision to exclude the 1980 murder evidence, and the appeals court's decision that such evidence created no more than a mere suspicion of third-party guilt, thus lacked the full picture of why the State chose not to prosecute Bailey in 1990. But the fact remains that, even with knowledge of the fingerprint report and the corresponding understanding of the State's investigation, the Michigan Court of Appeals could have still found the connection between the two murders too attenuated to reverse the verdict. The murders were nine years apart and, in addition to some similarities, included meaningful differences. Fairminded jurists could conclude that, even with knowledge of the fingerprint report, the two murders were sufficiently attenuated to permit exclusion of evidence of the 1980 murder under *Holmes*. AEDPA therefore requires that we reverse the district court's grant of Bailey's habeas petition.

Separate from his *Brady* claim, Bailey also challenges the Michigan Court of Appeals's *Holmes* claim directly. In other words, Bailey argues that even ignoring the suppressed evidence, all fairminded jurists would find the rejection of his *Holmes* claim on direct appeal to be incorrect. Because we concluded in our *Brady* analysis above that fairminded jurists could disagree on the *Holmes* analysis *with* knowledge of the suppressed evidence, we must also conclude that fairminded jurists could disagree without it. Bailey's independent *Holmes* claim thus also fails under AEDPA.

## B. Ineffective Assistance of Counsel

Bailey cross-appeals the district court's denial of habeas relief for ineffective assistance of counsel, which requires a showing that counsel's performance fell below an objective standard of reasonableness and prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 687–

88 (1984). Courts defer to a counsel's discretionary choices if they might be considered sound trial strategy, and must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. AEDPA review of ineffective assistance of counsel claims is "doubly" deferential, asking "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105.

Bailey first argues that his trial counsel was ineffective for failing to timely object to the testimony of Detectives Miller and Pratt regarding the snow tracks they followed and their opinions regarding which shoes might have left those tracks. Bailey argues that this testimony was improperly admitted as expert testimony. On direct appeal, the Michigan Court of Appeals rejected this argument, concluding that any objection would have been futile because the opinions were based on the Detectives' own perceptions and thus admissible under Michigan Rule of Evidence 701. *Bailey*, 2007 WL 2141362 at *6. On habeas review a federal court may not "reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991). Moreover, we agree with the district court that the Michigan Court of Appeals correctly applied Michigan law, because the Detectives' testimony was based on their direct observations and personal conclusions based on those observations. Therefore, we affirm the district court's denial of habeas relief for Bailey's first claim of ineffective assistance of counsel.

Second, Bailey argues that his trial counsel was ineffective for agreeing to admit Dr. Frederick's expert report and an FBI report about whether the snow tracks were made by Bailey's shoes in lieu of calling Dr. Frederick and the author of the FBI report to testify in person. The Michigan Court of Appeals rejected this argument by concluding that Bailey himself had arguably waived this claim when he affirmatively agreed to this arrangement during trial, and, even if not, the decision was within the range of reasonable trial strategy. *Bailey*,

2007 WL 2141362 at *7. We agree. Calling the experts to testify could have hurt Bailey by drawing attention to the experts' conclusions that the tracks corresponded to Bailey's shoe size and type. It is also unlikely that the decision not to call the experts prejudiced Bailey. The jury saw these experts' reports, and the most Dr. Frederick and the FBI could conclude was that the evidence was insufficient to make any definite conclusions regarding which shoes made the snow tracks; neither expert could necessarily exclude Bailey's shoes.

Besides *Strickland*, Bailey argues that the Michigan court opinions were contrary to *United States v. Chronic*, which held that a presumption of prejudice applies if counsel "entirely fails to subject the prosecution's case to meaningful adversarial testing." 446 U.S. 648, 659 (1984). In this case, however, Bailey's trial counsel effectively cross-examined the prosecution's expert, Truszkowski, eliciting the concession that (like Dr. Frederick and the FBI author) he could not confirm that Bailey's shoes made the snow impressions. *See Bailey*, 2007 WL 2141362 at *7 n.5.

For these reasons, we affirm the district court's denial of habeas relief for Bailey's second claim of ineffective assistance of counsel, especially given the double deference due under *Strickland* and AEDPA.

## C.  Admission of Other Bad Acts Evidence

Finally, Bailey also cross-appeals the district court's denial of habeas relief for the trial court's admission of other bad acts, specifically the evidence of Bailey's burglaries. Bailey argues that although the district court admitted evidence of the burglaries to show a common scheme or plan, the prosecution argued on opening and closing that the evidence showed a modus operandi and established Bailey's identity as the person who murdered Pine. The Michigan Court of Appeals rejected this argument, concluding that the trial court did not abuse its discretion in admitting the evidence to show a plan or scheme under Michigan Rule of

Evidence 404(b)(1). *Bailey*, 2007 WL 2141362, at *3. As noted above, the state court's decision on state law is usually unreviewable on federal habeas review, and that is especially so regarding rulings on the admission or exclusion of evidence. *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).

Habeas relief may be warranted, however, when "an evidentiary ruling is so egregious that it results in a denial of fundamental fairness" and thus violates due process. *Id. Bugh* held that as of 2003 there was no clearly established Supreme Court precedent holding that the admission of other bad acts as propensity evidence violated due process. *Id.* at 512–13. Bailey cites no Supreme Court authority establishing such a principle since 2003 (or at all). Therefore, the Michigan Court of Appeals decision on this issue was not contrary to any decision of the U.S. Supreme Court, as required for habeas relief under AEDPA. We affirm the district court's denial of habeas relief for the trial court's admission of the evidence of the prior burglaries.

### III.    CONCLUSION

For the foregoing reasons, we are constrained to REVERSE the district court's grant of Bailey's habeas petition for violations of *Brady* and *Holmes*. We AFFIRM the district court's denial of Bailey's habeas petition for ineffective assistance of counsel and the admission of other bad acts evidence.